

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

---

### NO. PD-1035-11

---

**THE STATE OF TEXAS**

**v.**

**ALVARO MAZUCA, Appellee**

---

**ON STATE'S PETITION FOR DISCRETIONARY REVIEW FROM THE EIGHTH COURT OF APPEALS EL PASO COUNTY**

---

PRICE, J., delivered the opinion of the Court in which KEASLER, HERVEY, COCHRAN and ALCALA, JJ., joined. MEYERS, J., filed a dissenting opinion. JOHNSON, J., filed a dissenting opinion. KELLER, P.J., and WOMACK, J., dissented.

### O P I N I O N

In this felony prosecution for possession of ecstasy, the State appealed from the trial court's grant of the appellee's motion to suppress evidence that the appellee contended was obtained as a result of an illegal traffic stop. The El Paso Court of Appeals affirmed the trial court's ruling in an unpublished opinion, holding that the appellee's initial detention was illegal and that the taint emanating from the initial illegality was not attenuated by the fact

that, immediately after the initial stop, the appellee was found to have an outstanding arrest warrant that might give rise to a valid search incident to arrest.[1]  We granted the State's petition for discretionary review to examine this holding and now reverse.

## FACTS AND PROCEDURAL POSTURE

### Motion to Suppress

The appellee was indicted for the offense of possession with intent to deliver more than four but less than 400 grams of methylenedioxy methamphetamine, popularly known as ecstasy, a first degree felony offense.[2]  Prior to trial, the appellee filed a motion to suppress evidence stemming from his initial detention in this case.  At a pre-trial hearing on March 19, 2009, the State's only witness was the arresting officer, El Paso Police Officer Christopher Grijalva.

Grijalva testified that, on December 11, 2008, he was assigned to patrol the Sunland Park Mall area on the west side of El Paso, along with his partner, Officer Mike Chavez. Grijalva and Chavez were part of the Westside Regional Command Center TAC patrol, a unit that does not respond to routine patrol calls but instead performs specific assignments.  On

---

[1]  *State v. Mazuca*, No. 08-09-00102-CR, 2011 WL 1533419 (Tex. App.—El Paso, Apr. 20, 2011) (not designated for publication).

[2]  *See* TEX. HEALTH & SAFETY CODE § 481.113(a) & (d) ("[A] person commits an offense if the person knowingly . . . possesses with intent to deliver a controlled substance listed in Penalty Group 2 [which offense] is a felony of the first degree if the amount of the controlled substance to which the offense applies is, by aggregate weight, including adulterants or dilutants, four grams or more but less than 400 grams.");  *id*. § 481.103(a) ("Penalty Group 2 consists of [*inter alia*] 3,4-methylendioxy methamphetamine").

this particular day, the TAC patrol was tasked with looking for traffic violators. At approximately 10:00 p.m., the officers were conducting a separate traffic stop when Grijalva noticed a yellow Mustang that pulled into the parking lot of the mall with what Grijalva perceived to be defective taillights. The taillights appeared to Grijalva to emit white light, whereas by statute they should be red.[3] Once they completed their traffic stop, Grijalva and Chavez once again observed the yellow Mustang, now parked in the mall parking lot. At around 10:20 p.m., they observed the Mustang begin to move again. After alerting other members of the TAC patrol, they stopped it for the perceived taillight infraction. They had no other reason to stop the Mustang—they did not suspect the occupants of any other crime, nor were they aware that the occupants might be the subject of any outstanding warrants.

While Chavez checked the driver's identification and proof of financial responsibility, Grijalva approached the passenger side of the Mustang, where the appellee sat, and asked the appellee for identification. Without speaking, the appellee produced a driver's license, and both Chavez and Grijalva returned to their squad car to check for outstanding warrants. When their computer showed that the appellee had at least a pair of outstanding warrants, they contacted the warrants office and confirmed that the warrants were active.[4] Grijalva

---

[3] *See* TEX. TRANSP. CODE § 547.322(d) ("A taillamp shall emit a red light plainly visible at a distance of 1,000 feet from the rear of the vehicle.").

[4] Grijalva could not remember whether the appellee had two or three outstanding warrants, and the warrants themselves were not offered into evidence. The driver of the Mustang, Isaac Medina (apparently the appellee's cousin), had "more than five" outstanding traffic warrants.

returned to the passenger side of the Mustang and asked the appellee to step out. When the appellee complied, Grijalva asked him whether he was aware that he had outstanding warrants, to which the appellee "kind of looked at [Grijalva] and then said yes, I know I have warrants." Grijalva then "escorted" the appellee to the squad car and "asked him to put his hands on the vehicle." Intending to pat the appellee down for safety purposes, Grijalva first "asked him if he had anything illegal on him, any weapons or anything else. At which point he stated yes, he did." When Grijalva asked him what he had, the appellee answered that there was ecstasy in a black pouch in his right front pants pocket. Grijalva subsequently "placed [the appellee] into custody," patted him down, discovered and seized the ecstasy as well as a small baggie of marijuana, and then put the appellee in the back seat of the squad car. The appellee volunteered that the Mustang belonged to his cousin, and that there was "a black zippered bag under the front passenger seat" that did not belong to his cousin. Grijalva retrieved the bag and found that it contained additional baggies of marijuana.

The owner and driver of the Mustang, Isaac Medina, testified for the defense at the motion to suppress hearing. Five years before the traffic stop he had modified his taillights to include "some clear rear lights," but they retained "red lights in the middle[.]" Medina had never before gotten a ticket, and the car had always passed the annual state inspection. He denied that his Mustang ever "had any white or – any white emitting taillights." Photographs of the rear of the Mustang were introduced into evidence showing the condition of the taillights as of the time of the traffic stop. The State then recalled Grijalva to the stand and

showed him the photographs, which were taken in daylight. Grijalva maintained that the taillights looked much different when illuminated at night. Asked whether, on the night of the stop, "there was any red emminating [sic] from those . . . taillights?", he replied: "There was mostly white. From what I distinctly saw it was mostly white. I don't recall if we got close and saw that there was any red. But the white dominated the red color."

Counsel for appellee urged the trial court to discount Grijalva's testimony.

> [DEFENSE COUNSEL]: Your Honor, I believe that the Court has the photographs of the taillights in front of him. And as you see the taillights have a clear casing. The bulbs themselves are red. You can see that. You have them in front of you. The light would either be red or not lit at all. And I think the officer's testimony to the contrary is not credible and not believable.[5]

For her part, the prosecutor reminded the trial court that the photographs had been taken in daylight and that Grijalva had observed them at night. She argued, alternatively, that even if the stop was illegal, "there is case law out there that states that if there is a warrant out for the defendant, an illegal stop doesn't taint the warrants for the arrest."[6] The trial court asked the prosecutor to produce those cases and took the matter under advisement.

### Trial Court's Findings and Conclusions

On March 25, 2009, the trial court signed an order granting the appellee's motion to suppress but did not enter findings of fact and conclusions of law. That same day, the State

---

[5] The record before us contains only black and white reproductions of the photographs.

[6] The prosecutor cited *Johnson v. State*, 496 S.W.2d 72 (Tex. Crim. App. 1973), *Reed v. State*, 809 S.W.2d 940 (Tex. App.—Dallas 1991, no pet.), and *Lewis v. State*, 915 S.W.2d 51 (Tex. App.—Dallas 1995, no pet.).

filed a request for findings of fact and conclusions of law.[7]  On April 9, 2009, the trial court

duly entered written findings and conclusions.[8]  Those findings and conclusions, in relevant

part, read:

### FINDINGS OF FACT:

1.    On December 11, 2008, at approximately 10:20 p.m. Officer Grijalva
      and Officer Chavez of the El Paso Police Department detained a yellow
      Mustang vehicle in the parking lot of the Linens n Things on the
      Westside of El Paso, Texas.

2.    The trial court having heard the testimony and having evaluated the
      demeanor of the witnesses finds that Officer Chavez's [sic: Grijalva]
      testimony that he had a reasonable belief that Transportation Code
      547.322 had been violated to not be credible.

3.    The trial court having heard the testimony and having evaluated the
      demeanor of the witnesses finds that Officer Chavez [sic] did not have
      a reasonable belief that the yellow Mustang had white lights to the rear.

4.    The trial court having evaluated and heard the testimony of Isaac
      Medina finds his testimony to be credible and that the photographs
      admitted as Defense exhibits 1-6 fairly and accurately depict the vehicle
      and [its] lights as they appeared when the vehicle was stopped on
      December 11, 2008.

* * *

7.    The trial court finds that [the] yellow Mustang's [taillights] emitted red
      light on December 11, 2008.

---

[7]

   *See State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006) (on request of losing party, trial
court is required to enter express findings of fact and conclusions of law).

[8]

   Those findings and conclusions were signed, however, by a different judge than the judge
who had presided over the hearing on the motion to suppress on March 19th—the record does not
reveal why.

* * *

11.    The trial court having evaluated the credibility of the witnesses finds that there was no other reason for the detained [sic] of the vehicle other than white lights to the rear.

* * *

14.    The trial court finds that [the appellee] was not read his Miranda warnings.

15.    The trial court finds that the questioning of [the appellee] and the discovery of contraband were not only in close temporal proximity but were in fact almost simultaneous.

* * *

17.    The trial court finds that [the appellee] did not volunteer any information but rather answered the [officer's] questions when he provided his identifying information.

18.    The trial court finds that [the appellee] was not free to leave from the time that the yellow Mustang that he was a passenger in was detained.

19.    The trial court finds that [the appellee] was placed under arrest for outstanding warrants after he was detained and questioned by Officer Chavez [sic] after being a passenger in the yellow [M]ustang that was detained by Officer Chavez and Officer Grijalva.

### CONCLUSIONS OF LAW[:]

1.    The driver of the Mustang did not violate Section 547.322 of the Transportation Code on December 11, 2008.

2.    The Police Officers did not have probable cause or reasonable suspicion to perform a traffic stop on that date.

3.    The arrest warrants of the Defendant did not purge the taint of the illegal stops due to the flagrancy of the police action, the close temporal proximity and the fact that no Miranda warnings were read.

From these findings and conclusions, the State appealed.[9]

## On Appeal

The court of appeals deferred to the trial court's credibility determination with respect to Grijalva's testimony regarding the basis of the stop and held accordingly that the arresting officers "lacked justification to make the stop at its inception because the car's taillights were not white, as the officer testified."[10] Proceeding to the question whether the taint from that illegal stop may have been attenuated by Grijalva's immediate discovery of the outstanding arrest warrants, the court of appeals acknowledged case law from this Court and other courts of appeals holding "that the discovery of a valid warrant, even in a situation involving an illegal detention, breaks the connection between the primary taint and the subsequently discovered evidence."[11] Nevertheless, to hold that the discovery of the appellee's arrest warrants dissipated the taint of the unlawful stop on the facts of this case, the court of appeals observed, would serve only to "encourage the seizure of suspects upon inadequate grounds while an investigation is conducted for the purpose of establishing probable cause or discovering the existence of search warrants."[12] For this reason, the court of appeals rejected

---

[9] TEX. CODE CRIM. PROC. art. 44.01(a)(5).

[10] *Mazuca*, *supra*, at *3.

[11] *Id*.

[12] *Id*. (quoting *Reed* , *supra*, at 948 n.3). The court of appeals also contrasted this case to *Fletcher v. State*, 90 S.W.3d 419 (Tex. App.—Amarillo 2002, no pet.). In *Fletcher*, the Amarillo

the State's argument that Grijalva's discovery of the appellee's outstanding traffic warrants purged the taint of the primary illegality of the initial stop.[13]  We granted the State's petition for discretionary review to address its contention that this holding conflicts with this Court's opinion in *Johnson v. State*,[14] and, more pointedly, with the holdings of several other courts of appeals in Texas.[15]

## THE ATTENUATION OF TAINT DOCTRINE

### *Wong Sun* and *Johnson*

The Fourth Amendment exclusionary rule exclusively serves a function of deterrence, to discourage undue police encroachment upon the privacy and personal integrity of the citizenry.[16]  Because of the substantial social costs involved in exercising this deterrent

---

court of appeals assumed without deciding that the initial detention was illegal, but held that the taint from any such primary illegality was dissipated by the immediate discovery of an arrest warrant. *Id*. at 420-21.  "This case differs from *Fletcher*[,]" the court of appeals here opined, "in that the trial court rejected the only basis for stopping the Mustang, *i.e.*, its allegedly defective taillights." *Mazuca*, *supra*, at *3.  It seems to us, however, that, whatever authoritativeness we may find *Fletcher* to have, its holding with respect to attenuation of taint would not be diluted in any measure by the fact that it assumed, without deciding, the illegality of the initial detention.

[13]

 *Mazuca*, *supra*.

[14]

 496 S.W.2d 72 (Tex. Crim. App. 1973).

[15]

 TEX. R. APP. P. 66.3(a), (b) & (c).  Last year, in *State v. Elias*, we observed that, "[w]hile this Court has yet to directly weigh in on this issue, we note that a number of other jurisdictions have held that an intervening arrest warrant *may*, under certain circumstances, serve to attenuate taint, depending upon an application of the attenuation factors of *Brown v. Illinois*[, 422 U.S. 590, 603-604 (1975)]."  339 S.W.3d 667, 678 (Tex. Crim. App. 2011).

[16]

 *See Mapp v. Ohio*, 367 U.S. 643, 656 (1961) ("[T]he purpose of the exclusionary rule is to

function, however, application of the exclusionary rule should operate as a "last resort," not a "first impulse."[17] Accordingly, not every Fourth Amendment violation necessarily results in the suppression of evidence just because, but for that violation, the evidence would never have been exposed. As the Supreme Court observed in *Wong Sun v. United States*:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."[18]

We expressly invoked this attenuation of taint principle in *Johnson*.[19]

Johnson was arrested without a warrant and, he contended, without probable cause.[20]

When the arresting officer transported Johnson to the police station, he discovered an

---

deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.") (internal quotation marks and citation omitted).

[17] *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

[18] 371 U.S. 471, 487-88 (1963) (quoting Maguire, Evidence of Guilt, 221 (1959)). Although the appellee also invoked the exclusionary remedy of Article 38.23, TEX. CODE CRIM. PROC. art. 38.23(a), we have expressly held that the attenuation of taint doctrine also applies in determining whether evidence has been unlawfully "obtained" for purposes of this state law provision. *Johnson v. State*, 871 S.W.2d 744, 750 (Tex. Crim. App. 1994). *Cf. Bell v. State*, 724 S.W.2d 780, 787 (Tex. Crim. App. 1986) (invoking the attenuation of taint doctrine in applying Article 38.23's exclusionary rule with respect to violations of Texas statutory provisions).

[19] 496 S.W.2d at 74.

[20] *Id*. at 73-74.

outstanding warrant for his arrest emanating from another county.[21] Subsequent to the discovery of the arrest warrant, Johnson was photographed, and the photograph was used in a photographic line-up from which the victim of the robbery for which Johnson was prosecuted was able to identify him.[22] In a motion to suppress, Johnson challenged the admissibility of the photographic identification, his contention being that the photograph used was the product of the illegality stemming from his initial unlawful arrest.[23] We rejected this contention on direct appeal, holding that, "[e]ven if the arrest was illegal, it would appear that [Johnson's] detention at the time of the picture taking was not illegal."[24] We went on to conclude that the "identification testimony would have been obtained regardless by means sufficiently distinguishable from the underlying illegality to be purged of the primary taint[,]" citing for authority the above passage from *Wong Sun*.[25]

---

[21] *Id*. at 74.

[22] *Id*. at 73-74.

[23] *Id*. at 73.

[24] *Id*. at 74. At the time *Johnson* was decided, in 1973, this Court had yet to become a discretionary review court.

[25] *Id*. *See also Johnson v. Louisiana*, 406 U.S. 356, 365 (1972) (identification line-up conducted following what Johnson argued was an unconstitutional arrest did not constitute fruit of the poisonous tree under *Wong Sun* in light of intervening events, namely, "he was brought before a committing magistrate to advise him of his rights and set bail" and counsel was appointed for him; the line-up was conducted "under the authority of the commitment" and not by exploitation of the initial arrest).

### *Brown v. Illinois*

Two years after *Johnson*, the Supreme Court elaborated upon *Wong Sun* and the attenuation of taint doctrine in *Brown v. Illinois*.[26] Brown was arrested "without probable cause and without a warrant."[27] The arresting officers took him to the police station for interrogation, issuing him his *Miranda* warnings at the outset.[28] On appeal, Brown argued that the resulting confession should have been suppressed at trial under the Fourth Amendment because it was the product of his illegal arrest.[29] The Illinois Supreme Court disagreed, holding that the taint of the primary illegality was attenuated when the offending officers issued Brown his *Miranda* warnings before taking his confession, thus assuring its voluntariness.[30] Carefully delineating Fourth and Fifth Amendment rights, however, the Supreme Court reversed, holding that, by themselves, *Miranda* warnings cannot serve as an intervening event sufficient to purge the illegality of an unconstitutional arrest for purposes of applying the Fourth Amendment exclusionary rule.[31] While the presence or absence of

---

[26] 422 U.S. 590 (1975).

[27] *Id*. at 591.

[28] *Id*. at 594; *Miranda v. Arizona*, 384 U.S. 436 (1966).

[29] *Brown*, *supra*, at 596.

[30] *Id*. at 600.

[31] *Id*. at 601-03.

*Miranda* warnings and the apparent voluntariness of the confession are certainly factors for courts to consider in determining whether suppression is required, they are by no means the only factors.[32]   In addition, "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant."[33]  Applying these factors, the Supreme Court concluded that Brown's confession should have been suppressed.[34]

The instant case involves the proper application of the attenuation of taint doctrine, not to a confession, as in *Brown*, but to contraband that is seized immediately following an unconstitutional detention or arrest.  Will the discovery of an outstanding arrest warrant in the relatively few moments that ensue between the illegal stop and the seizure of the contraband invariably serve as an intervening event sufficient to purge the taint of the primary illegality?  In our opinion last year in *State v. Elias*, we observed that "this Court has

---

[32]   *Id*. at 603.

[33]   *Id*. at 603-04 (internal citations omitted).

[34]   *Id*. at 604-05.  *See also Dunaway v. New York*, 442 U.S. 200, 219 (1979) (confession should have been suppressed as fruit of the poisonous tree where "[n]o intervening events broke the connection between [Dunaway's] illegal detention and his confession"); *Taylor v. Alabama*, 457 U.S. 687, 691-93 (1982) (confession was the fruit of Taylor's illegal arrest even though it did not take place until six hours after the arrest, where he remained in police custody, unrepresented and under interrogation; moreover, that an arrest warrant was obtained after the illegal arrest could not serve as an intervening circumstance adequate to attenuate taint where the evidence used to establish probable cause for the warrant was itself a fruit of the primary illegality).

yet to directly weigh in on this issue,"[35] at least since *Johnson*, and then *Brown*, were decided. But a number of courts of appeals in Texas have, as have many other jurisdictions across the country.

## The Courts of Appeals in Texas

In a line of cases spanning the last twenty years, several courts of appeals in Texas have held that the discovery of an arrest warrant, after an illegal detention or arrest but before the consequent discovery and seizure of contraband, "may" serve to break the causal connection between the initial illegality and the subsequent seizure so as to purge the primary taint. The first and most comprehensively reasoned opinion in this line of cases is that of the Dallas Court of Appeals in *Reed v. State*.[36] Characterizing the issue as one "of first impression" in Texas,[37] the court of appeals in *Reed* boiled it down as follows.

> [W]hether, when during the course of an illegal detention of appellant for the stated purpose of determining appellant's identity, a valid warrant for the arrest of appellant was discovered upon establishing appellant's identity and appellant was arrested under authority of that warrant, contraband found during the subsequent book-in inventory search is admissible into evidence against appellant because the existence of the warrant sufficiently attenuates the connection between the illegal detention and the discovery of the contraband.[38]

---

[35] 339 S.W.3d 667, 678 (Tex. Crim. App. 2011).

[36] 809 S.W.2d 940 (Tex. App.—Dallas 1991, no pet.).

[37] *Id*. at 945.

[38] *Id*.

While acknowledging this Court's opinion in *Johnson*, the *Reed* court proceeded to resolve this issue specifically by reference to the attenuation factors identified in *Brown*, excluding the question of whether Reed received *Miranda* warnings (presumably because the case did not involve the attempted suppression of a confession, but only of contraband).

> Addressing the temporal-proximity factor first, the court of appeals observed:
>
> > In the present case, we conclude that the temporal proximity between the first illegal arrest and the second legal arrest does not bear on the attenuation. This factor has been cited and considered exclusively in cases where confessions or statements were obtained from a suspect subsequent to an illegal arrest. We also reason that, unlike the confession cases, where the statements can be seen as a psychological product of the arrest, the diminution of the likelihood of the discovery of physical evidence as a result of the illegal arrest cannot be a function of the passage of time. Thus, we conclude that the temporal proximity factor is of no moment in this case.[39]

Turning next to the intervening-circumstances factor, the *Reed* court held "that *Johnson* stands for the proposition that discovery of an outstanding warrant during an illegal detention of an individual breaks the connection between the discovered evidence and the primary taint."[40] Notwithstanding the seemingly determinative nature of this holding, the court of appeals nevertheless went on to address the purpose and flagrancy of the police misconduct as well, finding "nothing in the record that indicates that the transportation of appellant to the identification section [of the police department] was done for the purpose of . . .

---

[39] *Id*. at 946-47 (internal citations omitted).

[40] *Id*. at 947.

providing a pretext for a search."[41]  Having found both an intervening event and the absence

of any purposeful or flagrant police misconduct, the court of appeals held that the trial court

properly denied Reed's motion to suppress.[42]

Since *Reed* was decided, a number of other court of appeals opinions have cited it as

authority for the proposition that the intervention of a valid arrest warrant between an illegal

arrest or detention and the subsequent discovery and seizure of contraband will suffice to

attenuate the taint of the primary illegality.[43]  Unlike *Reed*, however, these subsequent court

of appeals opinions seem to turn exclusively on the intervening-circumstance factor, as if that

factor alone were categorically sufficient to establish attenuation, without any need to

incorporate the purpose-and-flagrancy factor into the analysis.[44]  Although this Court has yet

to address the question of which of the *Brown* factors should apply in this context, and how

they should apply, the highest courts in a number of other jurisdictions have.

### Other Jurisdictions

Practically every other jurisdiction to address the question of attenuation of taint to

----

[41]

   *Id*. at 948.

[42]

   *Id*.

[43]

   *Brooks v. State*, 830 S.W.2d 817 (Tex. App.—Houston [1ˢᵗ Dist.] 1992, no pet.); *Welcome v. State*, 865 S.W.2d 128 (Tex. App.—Dallas 1993, pet. ref'd); *Lewis v. State*, 915 S.W.2d 51 (Tex. App.—Dallas 1995, no pet.); *Fletcher v. State*, 90 S.W.3d 419 (Tex. App.—Amarillo 2002, no pet.); *Hudson v. State*, 247 S.W.3d 780 (Tex. App.—Amarillo 2008, no pet.).

[44]

   *Brooks*, *supra*, at 821;  *Welcome*, *supra*, at 133-34;  *Lewis*, *supra*, at 54;  *Fletcher*, *supra*, at 420-21;  *Hudson*, *supra*, at 787.

the illegal seizure of physical evidence has deemed it appropriate to apply three of the *Brown* factors[45]—temporal proximity, intervening circumstances, and the purposefulness or flagrancy of the police misconduct—albeit with variable emphases. For example, while no other court since *Reed* has declared temporal proximity wholly irrelevant, many courts have downplayed its significance, particularly when the discovery of an arrest warrant separates an initial illegal stop from the seizure of contraband.[46] Other courts have tended, like our own courts of appeals after *Reed*, to briefly mention all three of the *Brown* factors while highlighting the intervening circumstance factor—namely, the interceding discovery of an arrest warrant—as practically determinative of attenuation.[47] But the latest trend seems to

---

[45]

*Elias*, *supra*, at 678 n.35. We agree with the State that, when the primary illegality does not generate a statement or confession, the remaining *Brown* factor, *viz.*, whether the subject was given his *Miranda* warnings, and if so, when, has no logical application. State's Brief at 22.

[46]

*See People v. Hillyard*, 589 P.2d 939, 941 (Colo. 1979) (*en banc*) (citing *Brown* but, in context of the suppression of contraband, applying only "degree of police misconduct and any relevant intervening circumstances"); *United States v. Green*, 111 F.3d 515, 521 (7th Cir. 1997) (applying the three *Brown* factors but noting that temporal proximity, while militating in favor of suppression, is not dispositive); *State v. Hill*, 725 So. 2d 1282, 1284 (La. 1998) (same); *United States v. Johnson*, 383 F.3d 538, 544-45 & n.7 (7th Cir. 2004) (applying the three *Brown* factors but noting that "when a lawful arrest due to an outstanding warrant is the intervening circumstance, the temporal component is less relevant than in situations where the police exploit an illegal detention to create a predictable response (*e.g.*, confession or consent to search)"); *State v. Martin*, 179 P.3d 457, 463 (Kan. 2008) (applying the *Brown* factors but noting that temporal proximity, while "it weights heavily against the State[,]" is not dispositive, given an intervening warrant and the lack of purposeful police misconduct).

[47]

*See State v. Thompson*, 438 N.W.2d 131, 137 (Neb. 1989) (citing *Brown* but discussing only the intervening circumstances factor and finding that factor to be determinative); *State v. Jones*, 17 P.3d 359, 360-61 (Kan. 2001) (resolving the attenuation issue almost exclusively with respect to the intervening circumstance of the discovery of an arrest warrant between the time of the challenged stop and the seizure of contraband); *State v. Page*, 103 P.3d 454, 459 (Idaho 2004) (noting the three

be for courts to downplay both the temporal proximity factor and, to a lesser extent, the intervening circumstance factor in preference to the purposefulness-and-flagrancy factor, reasoning that it is this third factor that most directly serves the policy of deterrence that fuels the exclusionary rule in the first place.[48] We favor this emerging trend.

Illustrative of the trend is last year's opinion of the Arizona Supreme Court in *State v. Hummons*.[49] At trial, Hummons claimed that certain contraband seized from his person should be suppressed because it was the product of an illegal detention.[50] The trial court denied the motion to suppress, holding that the stop had constituted a consensual encounter, not a detention sufficient to trigger Fourth Amendment concerns.[51] The intermediate appellate court affirmed, but on a different basis, declaring that, even if Hummons was

---

*Brown* factors but seemingly finding discovery of an outstanding warrant to be practically determinative in "dissipating the taint of an unlawful seizure"); *Jacobs v. State*, 128 P.3d 1085, 1089 (Okla. Crim. App. 2006) (same).

[48] *State v. Frierson*, 926 So. 2d 1139, 1144-45 (Fla. 2006); *United States v. Simpson*, 439 F.3d 490, 495-97 (8th Cir. 2006); *People v. Brendlin*, 195 P.3d 1074, 1079-81 (Cal. 2008); *United States v. Faulkner*, 636 F.3d 1009, 1015-17 (8th Cir. 2011). *But see United States v. Gross*, 662 F.3d 393, 401-06 (6th Cir. 2011) (finding no attenuation of taint with respect to the introduction of physical evidence, even though the purposefulness-and-flagrancy factor did "not weigh heavily in the attenuation determination[,]" because the discovery of arrest warrant in between the illegal stop and the seizure of that evidence "resulted from means that are indistinguishable from the illegal stop, and thus the warrant does not dissipate the taint of the unlawful detention in this case").

[49] 253 P.3d 275 (Ariz. 2011).

[50] *Id*. at 277.

[51] *Id*.

illegally detained, the subsequent search of his backpack that exposed the contraband occurred only after the arresting officer discovered that Hummons had an outstanding arrest warrant.[52] The Arizona Supreme Court granted review of the intermediate court's attenuation of taint analysis.[53]

Applying the three attenuation factors from *Brown*, the Arizona Supreme Court agreed with the intermediate court that the temporal proximity factor favored suppression, since the seizure of the contraband occurred within a few minutes of the stop.[54] But it also agreed with the lower court's assessment that "this is the least important *Brown* factor."[55] The *Hummons* court next confirmed the lower court's conclusion that the discovery of the arrest warrant indeed qualified as an intervening circumstance.[56] But it found that the lower court had erred to regard this factor as essentially determinative in itself, observing that the intermediate court had

> overemphasized the importance of the warrant as an intervening circumstance in attenuating an illegal detention's taint upon evidence discovered in a search incident to arrest. If the purpose of an illegal stop or seizure is to discover a warrant—in essence, to discover an intervening circumstance—the fact that a

---

[52] *Id.*

[53] *Id.* at 276.

[54] *Id.* at 278.

[55] *Id.*

[56] *Id.*

warrant is actually discovered cannot validate admission of the evidence that is the fruit of the illegality.

> If, as the court of appeals suggested, a warrant automatically dissipated the taint of illegality, law enforcement could then create a new form of police investigation by routinely illegally seizing individuals, knowing that the subsequent discovery of a warrant would provide after-the-fact justification for illegal conduct.[57]

For this reason, the Arizona Supreme Court determined that "the subsequent discovery of a warrant is of minimal importance" in the attenuation of taint analysis.[58]

By contrast, "[t]he purpose and flagrancy of illegal conduct, the third *Brown* factor, . . . goes to the very heart and purpose of the exclusionary rule."[59] Noting that *Brown* itself had deemed the third factor "particularly" important,[60] the *Hummons* court observed:

> Factors such as an officer's regular practice and routines, an officer's reason for initiating the encounter, the clarity of the law forbidding the illegal conduct, and the objective appearance of consent may all be important in this inquiry. By focusing on officer conduct, courts may distinguish between ordinary encounters that happen to devolve into illegal seizures and intentionally illegal seizures for the purpose of discovering warrants.[61]

Applying the three *Brown* factors as thus prioritized, the Arizona Supreme Court found that

---

[57] *Id.* (citations and internal quotation marks omitted).

[58] *Id.*

[59] *Id.*

[60] *Id.* (citing *Brown*, *supra*, at 603-04).

[61] *Id.* at 279.

any taint from the initial stop was attenuated, focusing particularly on the lack of any evidence in the record to suggest that the detaining officer had deliberately made the stop in the hope of revealing an outstanding arrest warrant that would justify a search.[62]

## Conclusion

We agree with the Arizona Supreme Court's general assessment. In our view, the first *Brown* factor is certainly relevant,[63] but, even though it usually favors suppression of evidence that is discovered in the immediate aftermath of an illegal pedestrian or roadside stop, it will sometimes prove to be, in the context of the seizure of physical evidence, "the least important factor"—at least relative to the other two. And while we are hesitant to confirm as a categorical matter that the intervening circumstance of a valid arrest warrant is "of minimal importance"—after all, without it, there can usually be no attenuation of taint when physical evidence is unearthed immediately after an illegal stop—we agree that it should not be overemphasized to the ultimate detriment to the goal of deterrence that animates the exclusionary rule. Finally, we agree that the more important factor is the

---

[62] *Id.*

[63] Thus, we reject the State's argument that the first *Brown* factor should "only apply to the taking of a confession or statement after the initial illegal arrest, not the discovery of physical evidence as in this case." State's Brief at 22. Indeed, in a given fact scenario, it will often be the case that temporal proximity will prove the determinative factor in whether the exclusionary rule should apply. In the instant case, for example, had Officer Grijalva not discovered an outstanding warrant for the appellee's arrest, the brief period of time from the illegal stop to the disclosure of contraband would counsel compellingly in favor of suppression even in the absence of any particular purposefulness or flagrancy in the perpetration of the illegal stop.

purposefulness and flagrancy, *vel non*, of the primary illegal conduct—whether the police have deliberately perpetrated what they know to be an illegal stop in the specific hope or expectation that it will generate some legitimate after-the-fact justification to arrest and/or search, or they have otherwise conducted themselves in particularly egregious disregard of the right to privacy and/or personal integrity that the Fourth Amendment protects. For, when this is the case, to admit the physical evidence because of the fortuity that an arrest warrant happens to come to light before the evidence is discovered perversely serves to encourage, rather than discourage, official misconduct and renders the Fourth Amendment toothless.

To summarize: When police find and seize physical evidence shortly after an illegal stop, in the absence of the discovery of an outstanding arrest warrant in between, that physical evidence should ordinarily be suppressed, even if the police misconduct is not highly purposeful or flagrantly abusive of Fourth Amendment rights. Under this scenario, temporal proximity is the paramount factor. But when an outstanding arrest warrant *is* discovered between the illegal stop and the seizure of physical evidence, the importance of the temporal proximity factor decreases. Under this scenario, the intervening circumstance is a necessary but never, by itself, wholly determinative factor in the attenuation calculation, and the purposefulness and/or flagrancy of the police misconduct, *vel non*, becomes of vital importance. To the extent that our pre-*Brown* analysis on direct appeal in *Johnson* placed practically exclusive emphasis on the intervening circumstance of an arrest warrant to justify

the admission of evidence following an illegal stop, we disapprove it.[64]

## ANALYSIS

### Standard of Review

In the instant case, at the State's request, the trial court entered express written findings of fact and conclusions of law with respect to the appellee's motion to suppress.[65] In reviewing the trial court's ultimate ruling on a motion to suppress, an appellate court must give "almost total deference" to the trial court's resolution of issues of historical fact and to its assessment of the weight and credibility of the testimony.[66] But, once having resolved all questions of historical fact and weight and credibility of the testimony in the light most

---

[64]

We do not mean to imply that *Johnson* was wrongly decided on its facts. The challenged evidence in *Johnson*, the photographs from which he was identified, were not taken immediately following Johnson's illegal detention and were preceded by the discovery of outstanding warrants for his arrest. There is no mention in our opinion of purposefulness or flagrancy in the detaining officer's conduct that would operate to prevent the discovery of the outstanding warrants from breaking the causal connection between the illegal stop and the taking of the photographs. Thus, we have no reason now to question our ultimate conclusion in *Johnson* that the evidence "would have been obtained regardless by means sufficiently distinguishable from the underlying illegality to be purged of the primary taint." 496 S.W.2d at 74.

[65]

*See Cullen*, *supra*, at 699 ("Effective from the date of this opinion, the requirement is: upon the request of the losing party on a motion to suppress evidence, the trial court shall state its essential findings. By 'essential findings,' we mean that the trial court must make findings of fact and conclusions of law adequate to provide an appellate court with a basis upon which to review the trial court's application of the law to the facts.").

[66]

*See Elias*, *supra*, at 673 (quoting *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000), which in turn quotes *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)) (reviewing court defers "to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor").

favorable to the trial court's resolution of the legal issues,[67] an appellate court then conducts a *de novo* review of the proper application of law to the factual disputes and credibility issues as thus resolved, in order to say whether the trial judge has reached the correct legal conclusion with respect to "the legal significance of the facts he has found."[68]

Here, the trial court found as a matter of historical fact that "the yellow Mustang's tail lights emitted red light" at the time of the stop, and it refused to give credence to Grijalva's testimony at the suppression hearing that he had "had a reasonable belief" that a traffic code violation had occurred. The State does not now contend that the trial court's historical finding of fact and its credibility determination are unsupported by the record and does not, at this stage, contest the trial court's consequent legal conclusion that the police "did not have probable cause or reasonable suspicion to perform a traffic stop" of the Mustang in which the appellee was a passenger. We therefore take this legal conclusion as a given and turn to the question whether the trial court properly applied the doctrine of attenuation of taint to the facts of the case to determine whether the unlawful stop should have resulted in suppression of the ecstasy found in the appellee's pocket.

---

[67]

*See id*. ("The appellate court should afford the same amount of deference to trial courts' rulings on 'application of law to fact questions,' also known as 'mixed questions of law and fact,' if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor.").

[68]

*State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008); *see also id.* ("[F]actual findings are who did what, when, where, how, or why. They also include credibility determinations. They do not include legal rulings on 'reasonable suspicion' or 'probable cause'; those are legal conclusions subject to *de novo* review, not deference.").

## Application of Law to Facts

Grijalva found the ecstacy in the appellee's pants pocket and seized it within minutes of the illegal stop—but not before first determining that the appellee had at least two outstanding arrest warrants and confirming that they were active. Thus, while the trial court was correct to conclude that the temporal proximity of the seizure of the ecstasy to the illegal stop supports suppression, that factor does not weigh very heavily in light of the intervening circumstance of the discovery of the valid arrest warrants.[69] The trial court also concluded that "the flagrancy of the police action" weighed in favor of suppression, but it made no findings of fact tailored to this conclusion. And indeed, the record is not particularly well developed with respect to this issue.[70] But what evidence there is in the record was

---

[69] The trial court considered Grijalva's failure to give the appellee *Miranda* warnings before discovering the ecstasy as a factor favoring suppression. The appellee now argues that this was a legitimate consideration because the appellee admitted having the ecstasy in his pocket before Grijalva actually conducted the pat-down search that secured it, and this admission came as a direct result of Grijalva's custodial query. Thus, the appellee's admission was part of the chain of causation that extended from the illegal stop to the ultimate seizure of the evidence used against him. Appellee's Brief at 13-15. But the appellee does not here challenge the admissibility of his admission itself—only of the ecstasy—and it is quite evident from Grijalva's testimony that he would have discovered the ecstasy in any event as part of his search of the appellee's person incident to his arrest under the outstanding warrants. Under these circumstances, we do not consider the lack of *Miranda* warnings to be a factor of any substantial weight at all.

[70] In *Elias*, we held that it would be contingently appropriate for the court of appeals to remand the cause to the trial court, under Rule 44.4 of the Rules of Appellate Procedure, so that the trial court could make more explicit findings with respect to a particular issue that had been expressly litigated at the hearing on the motion to suppress. 339 S.W.3d at 676-77 & 679 (citing TEX. R. APP. P. 44.4). We see no occasion likewise to remand the instant case. In *Elias*, the arresting officer testified that he had observed Elias fail to signal a turn within a hundred feet of an intersection, but the trial court failed to make a specific finding with respect to the credibility of that potentially dispositive testimony. *Id.* Here, there was little testimony at the suppression hearing specifically

undisputed and did not, in our view, support the trial court's application of the law to the facts.

As to purposefulness, the record shows that Grijalva and Chavez were part of a unit specifically tasked on that day with looking for traffic violators. There is no indication that they were making traffic stops for any purpose other than to enforce the traffic laws or that they harbored the specific hope or expectation that they might obtain the consent of motorists to search their vehicles or identify motorists with outstanding arrest warrants so that they might conduct searches incident to arrest. Nor does the record support a conclusion that Grijalva's conduct during the course of this concededly illegal traffic stop was flagrantly in derogation of the appellee's Fourth Amendment rights.[71] Grijalva did not demand that the

---

pertaining to the attenuation of taint factors, and none that seems particularly to have called for the trial court to evaluate witness credibility and demeanor. Nor did either party seek to reopen the suppression hearing to supplement the record with additional evidence respecting attenuation of taint. *See Black v. State*, 362 S.W.3d 626, 633-35 (Tex. Crim. App. 2012) (trial court has discretion to reopen hearing on motion to suppress evidence and may revisit its previous ruling in light of supplemental evidence presented therein). Consequently, we see nothing to be gained from a remand under Rule 44.4 to assure "the proper presentation of" the case on appeal.

[71] The appellee argues that for Grijalva and Chavez to have initiated the traffic stop on the basis of defective taillights was itself such a blatant illegality as to constitute some evidence of both purposefulness and flagrancy on their part. Appellee's Brief at 19-22. He relies upon *United States v. Lopez-Valdez*, in which the Fifth Circuit acknowledged that, under Texas law, "state police officers do not have authority to stop vehicles with cracked taillight lenses that 'permit[ ] some white light to be emitted with red light.'" 178 F.3d 282, 288 (5th Cir. 1999) (quoting *Vicknair v. State*, 751 S.W.2d 180, 187 (Tex. Crim. App. 1987). Moreover, the Fifth Circuit held that a traffic stop on this basis is so obviously unlawful that the Government could not invoke the good faith exception of the exclusionary rule to admit the fruit of the search following the unlawful stop because "no well-trained Texas police officer could reasonably believe that white light appearing with red light through a cracked red taillight lens constituted a violation of traffic law[,]" and "if officers are allowed to stop vehicles based upon their subjective belief that traffic laws have been violated even where no such violation has, in fact, occurred, the potential for abuse of traffic infractions as pretext

appellee, a passenger in the car, supply identification; he merely asked for it. Once the appellee assented to provide that information,[72] Grijalva immediately conducted a check for warrants, as he was entitled to do during a routine traffic stop, so long as that warrant check

---

for effecting stops seems boundless and the costs to privacy rights excessive." *Id*. at 289.

It is true that the trial court in this case expressly found that the officers "did not have a reasonable belief that the yellow Mustang had white lights to the rear" and that the "Mustang's tail lights emitted red light" at the time of the stop. Findings of Fact 3 & 7, respectively. But the trial court made no express finding of fact with respect to whether the taillights may have emitted some white light *and* some red light. In his redirect testimony, Grijalva seems to have acknowledged that the taillights may have been a mixture of red and white light, although he continued to maintain that "the white dominated the red color." We note that the trial court concluded only that the conduct of the officers was "flagrant"—*not*, specifically, that it was also purposeful. Conclusion of Law 3. While *Lopez-Valdez* makes it evident that Grijalva and Chavez *should* have known better than to conduct a traffic stop for the reason they did, nothing in the present record establishes that they actually *did* know. This may explain why the trial court failed to conclude that their conduct was purposeful, *i.e.*, a mere pretext for a fishing expedition. After all, why would a police officer with an ulterior motive, hoping that subsequent events will uncover reasonable grounds to conduct a search, deliberately choose what he *knows* does not constitute a genuine traffic violation as the purportedly objective basis for making the initial stop? As for the trial court's conclusion that the officers' conduct was flagrant, for reasons expressed in the text, *post*, we do not think the record fairly supports this conclusion. Even "granting the establishment of the primary illegality," *Wong Sun*, *supra*, at 488, the conduct of the officers was not at any time egregiously abusive. While "[t]he impropriety of the [stop] was obvious" in light of *Lopez-Valdez*, Grijalva did not exhibit any "awareness of that fact[,]" and the manner in which the stop was perpetrated does not "give[ ] the appearance of having been calculated to cause surprise, fright, [or] confusion." *Brown*, *supra*, at 605.

72    In its Finding of Fact 17, the trial court found that the appellee "did not volunteer any information but rather answered the officers [sic] questions when he provided his identifying information." But this does not mean that the appellee did not readily (if silently) comply with Grijalva's request for identification, and there was nothing improper about Grijalva's request. With respect to the driver of an automobile stopped for a traffic infraction, "an officer may demand identification[.]" *Davis v. State*, 947 S.W.2d 240, 245 n.6 (Tex. Crim. App. 1997). Even if a detaining officer may not similarly "demand" identification from a passenger, that is not what the evidence indisputably shows that Grijalva did in this case. *See St. George v. State*, 237 S.W.3d 720, 722 (Tex. Crim. App. 2007) ("[W]hile officers may question a passenger and request identification without separate reasonable suspicion of the passenger, they may not compel the passenger to answer or imply that compliance with the request is required.").

does not extend the legitimate duration of the traffic stop beyond the scope of its original justification.[73]  So, while the initial stop itself was illegal, Grijalva never went beyond the bounds of what would have been constitutionally permissible had the stop in fact been justified at its inception.  Under these circumstances, applying the law, as we have explicated it in this opinion, to the undisputed facts of the case in our *de novo* review, we conclude that the behavior of the arresting officers, although clearly unlawful at the outset, was not so particularly purposeful and flagrant that the discovery of the appellee's outstanding arrest warrants may not serve to break the causal connection between the illegal stop and the discovery of the ecstasy in the appellee's pants pocket, thus purging the primary taint.  We hold that the trial court erred to conclude otherwise.

The court of appeals nevertheless affirmed the judgment of the trial court out of what it deemed an overriding concern that a contrary ruling would "encourage" the police to undertake unlawful stops on a pretext, "for the purpose of establishing probable cause or discovering the existence of arrest warrants."[74]  We certainly share that concern.  However, we think that prioritizing the purposefulness and flagrancy factor satisfactorily addresses that concern without fashioning a rule that would altogether remove the intervening discovery of

---

[73]  *Davis*, *supra*;  *St. George*, *supra*;  *Kothe v. State*, 152 S.W.3d 54, 63-65 & n.36 (Tex. Crim. App. 2004);  *United States v. Brigham*, 382 F.3d 500, 507-08 (5ᵗʰ Cir. 2004);  George E. Dix & John M. Schmolesky, 40 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE §§13:32, 13:48 (3ʳᵈ ed. 2011).

[74]  *Mazuca*, *supra* (quoting *Reed*, *supra*, at 948 n.3).

an arrest warrant as a factor relevant to the attenuation of taint analysis, as the court of appeals opinion tended to do. The court of appeals adopted an approach that would effectively *presume* purposeful and/or flagrant police misconduct from the fact of the primary illegality alone rather than assessing the character of that illegality, and of any subsequent police conduct, to determine whether it indicates that they *actually* behaved purposefully or flagrantly in the particular case. We hold that the court of appeals erred to rely upon this de facto presumption to affirm the trial court's ruling on the appellee's motion to suppress. Applying the appropriate analysis today, we hold that the trial court should have denied that motion.

## CONCLUSION

Accordingly, we reverse the judgment of the court of appeals. We remand the cause to the trial court for further proceedings consistent with this opinion.

DELIVERED:      May 23, 2012
PUBLISH