

# Fourth Court of Appeals

### San Antonio, Texas

## OPINION

No. 04-13-00433-CR

Raymond **MCKINNEY**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 226th Judicial District Court, Bexar County, Texas
Trial Court No. 2012CR8329
Honorable Sid L. Harle, Judge Presiding

Opinion by:   Karen Angelini, Justice

Sitting:   Karen Angelini, Justice
Sandee Bryan Marion, Justice
Patricia O. Alvarez, Justice

Delivered and Filed:  August 13, 2014

REVERSED AND REMANDED

In the morning of May 17, 2012, Raymond McKinney was standing on a street in a high crime neighborhood, talking to another individual, when a patrol car turned onto the street, more than 100 yards from McKinney's position. McKinney turned and ran between two houses. The officers gave chase and arrested him for evading detention, subsequently finding illegal drugs on his person. McKinney filed a motion to suppress, arguing his constitutional rights were violated by the illegal search and seizure. After the trial court denied his motion, he was found guilty of possessing cocaine. He appeals, arguing that the trial court erred in failing to grant his motion to

suppress. Because we agree that McKinney's constitutional rights were violated, we reverse the trial court's judgment and remand for a new trial.

## BACKGROUND

At the suppression hearing, Officer Charles Hiller of the San Antonio Police Department, testified that on May 17, 2012, he and his partner were on patrol in a marked patrol car as part of the SAFFE unit ("San Antonio Fear Free Environment"). His partner, Officer Nick Stromboe, was driving. Officer Hiller testified that although they had not received a call regarding the 500 block of Corliss Street, they decided to patrol that area because the "500 block" of Corliss Street had had "numerous drug complaints," a "lot of gang activity," and "multiple shootings over there." "[I]t's a common street for the Bloods/Crips gang members to hang out and deal dope." A little after 9:00 a.m. on May 17, 2012, they "turned onto Corliss [Street] from the east–east end of the block." Officer Hiller testified that "as soon as [they] made the corner," Officer Hiller saw a man in "a black T-shirt, gray shorts, s[aw] him turn and then all of a sudden he took off running between the houses running northbound." That man was later identified as Appellant McKinney. According to Officer Hiller, McKinney was "a good hundred yards" away from the patrol vehicle when he started running. Officer Hiller testified that McKinney had been standing on a sidewalk with another man, Larry Coats, who remained where he was and did not run at the sight of the patrol vehicle. Officer Hiller testified that Larry Coats is a person who lives in the area and "comes to court a lot." Officer Hiller testified that when he and Officer Stromboe saw McKinney running away,

> We sped up and went down the street, and my partner dropped me off, and he sped around the block to try to cut [the suspect] off and catch him on the back street, Bundy. So I stayed there and was looking around to see which way he came.

Officer Hiller testified that he decided to follow McKinney after he ran "because of the drugs that are being sold there, the gang violence, the shootings." "It was very suspicious that when the police turned on the block all of a sudden he bolts and runs."

Because Officer Hiller could hear McKinney running back toward him, Officer Hiller stayed behind a little bush in the front yard. Officer Hiller saw McKinney appear and heard him ask Larry Coats, "Where are they at?" Officer Hiller then pulled out his taser and ordered McKinney to stop. According to Officer Hiller, McKinney "was very nervous." Officer Hiller then searched McKinney and found crack cocaine and a bag of pills in McKinney's pockets. Officer Hiller placed McKinney in the patrol car and did a search on his laptop computer. Officer Hiller then discovered McKinney had an outstanding warrant for assault bodily injury. When asked if McKinney was placed under arrest for outstanding warrants, Officer Hiller replied in the affirmative.

On cross-examination, Officer Hiller testified that when he was chasing after the suspect, he did not know the identity of whom he was chasing. Officer Hiller testified he was not aware the person whom he was chasing had active warrants. Officer Hiller testified that when he was chasing McKinney, he believed he could have arrested McKinney for evading arrest. Officer Hiller searched McKinney before he knew there was an active warrant for McKinney's arrest. On redirect, Officer Hiller clarified that he searched McKinney "after he ran and was detained for evading or under arrest for evading on foot, evading detention." Officer Hiller confirmed that when he searched McKinney, "[h]e's under arrest for evading detention." He also confirmed that after he arrested McKinney for evading and searched McKinney, Officer Hiller did a search on his computer and determined that McKinney had an outstanding warrant.

Officer Stromboe testified that after Officer Hiller detained McKinney, Officer Stromboe walked the path that McKinney had taken between the houses and found a gun lying on the ground.

Officer Stromboe turned to McKinney and asked, "Raymond did you throw the gun?" According to Officer Stromboe, McKinney replied, "Stromboe, I didn't have the gun. I had dope, but I didn't have the gun."

Defense witness, Quenten Williams, testified that on May 17, 2012, he was planning to go to the mall with McKinney and Larry Coats. He was waiting for them in a car "when the laws [sic] pulled up." According to Williams, he and Coats saw "the officer get behind a bush like on the opposite side of the fence or whatever; he was behind the bush. And then that's when we s[aw] Raymond [McKinney] come outside and the officer drew [sic] down on him." Williams testified that he never saw McKinney run away from the patrol car.

Officer Hiller was recalled as a witness and expanded on his earlier testimony. He testified that when he detained McKinney, he was going to arrest McKinney for evading arrest. According to Officer Hiller, when he asked McKinney why he had run, McKinney said that "he thought he had a warrant." Officer Hiller searched McKinney and found the pills and cocaine in McKinney's pockets. Officer Hiller then placed McKinney in the back seat of the patrol car. He did a search on his computer and determined that McKinney had an outstanding warrant.

McKinney also testified on his own behalf outside the presence of the jury for the purpose of the suppression motion. He testified he was going to the mall with his friends Quenten Williams and Larry Coats, who were waiting in the car. According to McKinney, he left his home from the back door and walked around the side of the house calling Larry's name when an officer came from behind a bush with his taser gun and told him to put his hands up. McKinney testified that he did not see the patrol vehicle and that he had not run away. He was handcuffed and then searched. According to McKinney, the officer pulled some drugs out from McKinney's pockets. After McKinney was placed in the patrol car, the officer ran a computer search and discovered

McKinney had an outstanding warrant. The trial court denied the motion to suppress, and the jury trial proceeded.[1]

Officer Hiller again testified, but this time in the presence of the jury. Officer Hiller expanded on why he chose to go after McKinney when McKinney ran away after seeing the patrol vehicle: "Because of all the crime that occurs on that block, the guns, the drug dealing. There's a– people with warrants on that block. It's just–it's a problem. So, his actions, seeing the police, realizing, A, there's a marked patrol car turning on our street and all of a sudden, he brakes and runs, he's–he's trying to hide something; in this case, drugs." Officer Hiller testified that after he stopped McKinney with his taser gun, he placed McKinney in handcuffs "[b]ecause he's–at–at this point, he's under arrest now for evading. And until we can investigate why he's running, is he running because he's got drugs, guns, weapons? Is he running because he's wanted?" Officer Hiller asked McKinney why he ran away, and McKinney said, "I think I have a warrant." Officer Hiller again testified that he searched McKinney, found the drugs, and then placed him in the patrol vehicle. After McKinney was placed in the patrol car, Officer Hiller ran McKinney's identification on his computer and determined McKinney had an outstanding warrant. On cross-examination, Officer Hiller testified that he was not aware McKinney had an active warrant when he was chasing after McKinney. Officer Hiller testified that although he arrested McKinney at the scene for evading arrest, McKinney was never actually charged with evading arrest. Officer Hiller also testified about DART, or Dangerous Assessment Response Team, and admitted that to his knowledge the house at 531 Corliss (the one McKinney was standing before and living in) had never come under DART review.

---

[1] Neither party requested that the trial court make findings of fact and conclusions of law, and no such findings were made by the trial court regarding the suppression motion.

Officer Stromboe then testified before the jury. Like Officer Hiller, he stated that they were aware of the high crime in the Corliss street area. When they turned the corner of Corliss Street, McKinney "was standing out in front of a known narcotics location gang house, and he just turns and runs–runs back towards the house. He was with another guy. The other guy stood still and he ran." Officer Stromboe testified that he did not recognize either individual because they were 100 yards away. However, once he was close to both individuals, he knew "them both very well." Officer Stromboe stopped the patrol car so that Officer Hiller could get out and chase the man who ran toward the house. Officer Stromboe testified that after Officer Hiller detained the man, who was identified as McKinney, Officer Stromboe walked the route McKinney had taken, looking for evidence.[2] Officer Stromboe testified that after Officer Hiller discovered illegal drugs in McKinney's pockets, McKinney admitted the cocaine and pills found belonged to him. On cross-examination, Officer Stromboe admitted neither he nor Officer Hiller knew the identity of the young men standing in front of the house at 531 Corliss when Officer Hiller began chasing one of them.

After hearing testimony from all the witnesses at trial, the jury found McKinney guilty of possessing cocaine. McKinney was sentenced to twelve years imprisonment. McKinney now appeals, arguing the trial court erred in denying his motion to suppress.

### MOTION TO SUPPRESS

McKinney argues that his rights under the Fourth Amendment were violated when he was seized and searched without a warrant. He points out that merely running at the sight of a police car, when that car is 100 yards away and no detention or arrest has been attempted by an officer, does not give the officer reasonable suspicion to detain him. Further, McKinney argues that merely

---

[2] The trial court sustained the defense's objection to Officer Stromboe testifying about discovering the gun, and Officer Stromboe's testimony before the jury made no mention of the gun.

being present in a high crime neighborhood does not give an officer reasonable suspicion to conduct an investigative detention. We agree with McKinney.

When reviewing a trial court's ruling on a motion to suppress, we give almost total deference to the court's determination of the historical facts that the record supports, especially when those fact findings are based on an evaluation of the witnesses' credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *see also State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006). We accord the same level of deference to the trial court's rulings on mixed questions of law and fact if those decisions turn on the credibility and demeanor of the witnesses. *Guzman*, 955 S.W.2d at 89. We review de novo mixed questions of law and fact that do not turn on witness credibility. *Id.* In this case, the trial court did not make explicit findings of fact and conclusions of law. Therefore, we review the evidence in the light most favorable to the trial court's ruling. *See Lujan v. State*, 331 S.W.3d 768, 771 (Tex. Crim. App. 2011); *Wilson v. State*, 311 S.W.3d 452, 458 (Tex. Crim. App. 2010). A "trial court necessarily abuses its discretion if it refuses to suppress evidence that is obtained in violation of the law and that is, therefore, inadmissible under article 38.23" of the Texas Code of Criminal Procedure. *Wilson*, 311 S.W.3d at 458.

A warrantless detention for the purpose of investigating possible criminal behavior is lawful where an officer can point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the intrusion. *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000).

In looking at the evidence in the light most favorable to the trial court's ruling, the officers' testimony was that they were patrolling a neighbor known for high crime when they decided to detain McKinney because he ran away from their patrol car. Officer Hiller testified that he then arrested McKinney for evading detention. A person commits the offense of evading detention "if

he intentionally flees from a person he knows is a peace officer or federal special investigator attempting lawfully to arrest or detain him." TEX. PENAL CODE ANN. § 38.04(a) (West Supp. 2014). Here, there is no evidence to support a finding that the officers had attempted to lawfully detain or arrest McKinney at the time he ran away toward the house on Corliss Street. The officers testified that as soon as they turned the corner of the street, McKinney ran away. Flight alone is insufficient to justify an investigatory detention. *Castillo v. State*, No. 04-10-00893-CR, 2011 WL 4830168, at *2 (Tex. App.—San Antonio 2011, no pet.); *Reyes v. State*, 899 S.W.2d 319, 325 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd); *see also Gurrola v. State*, 877 S.W.2d 300, 303 (Tex. Crim. App. 1994). And, flight from a show of authority is only a factor in support of a finding of reasonable suspicion that an individual is involved in criminal activity. *Castillo*, 2011 WL 4830168, at *2; *Reyes*, 899 S.W.2d at 325. Here, there was also no evidence of a show of authority by the officers at the time McKinney ran in a direction away from the patrol car. Thus, McKinney's running toward the house upon seeing the patrol vehicle, without more, cannot justify an investigatory detention. *See Castillo*, 2011 WL 4830168, at *2; *Reyes*, 899 S.W.2d at 325; *see also Salazar v. State*, 893 S.W.2d 138, 142 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd, untimely filed) (holding detention of a suspect who fled from a residence on which a search warrant was executed legal because at the time of the detention, (1) a magistrate had determined there was probable cause to believe persons inside the residence were involved in narcotics; and (2) appellant was present on those premises and immediately began to run when he saw the narcotics team approaching).

And, we agree with McKinney that his presence in a high crime area is also not sufficient to support an investigatory detention. *See Gamble v. State*, 8 S.W.3d 452, 454 (Tex. App.—Houston [1st Dist.] 1999, no pet.). Besides McKinney being present in a high crime neighborhood and running at the sight of a patrol vehicle, the record is devoid of any evidence of specific and

articulable facts that would have justified McKinney's detention for the purpose of investigating possible criminal behavior. *Compare Scott v. State*, 549 S.W.2d 170, 172-73 (Tex. Crim. App. 1976) (holding detention illegal even though it occurred in a "high crime area"; thefts had been committed in the area; the detainees were driving on a dark, sparsely traveled street at 1:30 a.m.; and materials were observed in the back of their car as it drove past the officers), *with Amorella v. State*, 554 S.W.2d 700, 702 (Tex. Crim. App. 1977) (holding detention legal when officer observed detainee's car with motor running and trunk open; it was 1:30 a.m.; the location was closed; the store's parking lot was in a "high crime" area; no store in the area was open; the car was parked immediately next to the store; and the car's occupants watched and then drove away as the officer drove by the scene). The officers admitted that they did not see McKinney commit any crime. He was simply standing and talking to another individual on a street in a high crime area. The officers were clear that they chased McKinney because he ran toward the house when they turned the corner of the street, more than 100 yards away from where McKinney was standing and talking. A person running at the sight of a patrol vehicle in high crime area, in and of itself, does not give an officer reasonable suspicion to conduct an investigatory detention.

The State argues that even if the officer did not have reasonable suspicion to chase after McKinney, the officer's discovery of an outstanding warrant during the detention broke the connection between the primary taint and the subsequently discovered evidence. For support, the State relies on *State v. Mazuca*, 375 S.W.3d 294 (Tex. Crim. App. 2012). In *Mazuca*, the court of criminal appeals explained that not every violation of the Fourth Amendment "necessarily results in the suppression of evidence just because, but for that violation, the evidence would never have been exposed." *Id.* at 300. Thus, the question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.*

(quoting *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)). The court of criminal appeals applied this attenuation of taint doctrine to contraband that was seized immediately following an unconstitutional detention or arrest. *Id.* at 302. It asked whether "the discovery of an outstanding arrest warrant *in the relatively few moments that ensue between the illegal stop and the seizure of the contraband* invariably serve as an *intervening event* sufficient to purge the taint of the primary illegality." *Id.* (emphasis added). The court then looked at "a line of cases spanning the last twenty years" where several courts of appeals had "held that the discovery of an arrest warrant, *after an illegal detention or arrest but before the consequent discovery and seizure of contraband*, 'may' serve to break the causal connection between the initial illegality and the subsequent seizure so as to purge the primary taint." *Id.* (emphasis added).

The court of criminal appeals considered three factors in determining whether the discovery of physical evidence is sufficiently attenuated from the violation: (1) the temporal proximity of the detention and the seizure of physical evidence; (2) the presence of intervening circumstances; and (3) the purposefulness or flagrancy of the police misconduct. *See id.* at 301-07. The court of criminal appeals concluded that "[w]hen police find and seize physical evidence shortly after an illegal stop, *in the absence of the discovery of an outstanding arrest warrant in between*, that physical evidence should ordinarily be suppressed, even if the police misconduct is not highly purposeful or flagrantly abusive of Fourth Amendment rights." *Id.* at 306 (emphasis added). "Under this scenario, temporal proximity is the paramount factor." *Id.* "But when an outstanding arrest warrant *is* discovered between the illegal stop and the seizure of physical evidence, the importance of the temporal proximity factor decreases." *Id.* (emphasis in original). "Under this scenario, the intervening circumstance is a necessary but never, by itself, wholly determinative factor in the attenuation calculation, and the purposefulness and/or flagrancy of the police misconduct, *vel non*, becomes of vital importance." *Id.* at 306-07 (emphasis in original).

With regard to the first factor, Officer Hiller testified that he searched McKinney immediately after detaining him. Thus, temporal proximity to the illegal detention weighs in favor of suppression. *See id.* at 306. With regard to the second factor of any intervening circumstances, Officer Hiller testified that he determined McKinney had an active warrant *only after* he had searched McKinney and found the illegal drugs. Nevertheless, according to the State, Officer Hiller's testimony that McKinney said he ran because he thought he had warrants was an intervening circumstance. However, Officer Hiller also testified that he did not know while he was searching McKinney whether McKinney had an active warrant. Thus, looking at the evidence in the light most favorable to the trial court's ruling, Officer Hiller did not discover the outstanding warrant until *after* he conducted the search and found the illegal contraband. Thus, the second factor also weighs in favor of suppression.

With regard to the third factor, the purposefulness or flagrancy of the police misconduct, we consider factors like an officer's reason for initiating the encounter, the clarity of the law forbidding the illegal conduct, and the objective appearance of consent. *See Mazuca*, 375 S.W.3d at 305-06. "By focusing on officer conduct, courts may distinguish between ordinary encounters that happen to devolve into illegal seizures and intentionally illegal seizures for the purpose of discovering warrants." *Id.* Here, the evidence does not reflect that the officers intentionally conducted an illegal detention for the purpose of discovering an outstanding warrant. However, in *Mazuca*, the court of criminal appeals emphasized that when, as in this case, "police find and seize physical evidence shortly after an illegal stop, in the absence of the discovery of an outstanding arrest warrant in between, that physical evidence should ordinarily be suppressed, even if the police misconduct is not highly purposeful or flagrantly abusive of Fourth Amendment rights." *Id.* at 306; *see id.* at 306 n.63 ("In the instant case, for example, had Officer Grijalva not discovered an outstanding warrant for the appellee's arrest, the brief period of time from the illegal stop to the

disclosure of contraband would counsel compelling in favor of suppression even in the absence of any particular purposefulness or flagrancy in the perpetration of the illegal stop."). Therefore, after applying all three factors, we conclude that the discovery of an outstanding warrant for McKinney's arrest did not dissipate the taint of the officers' violation of McKinney's rights under the Fourth Amendment.

Having determined that McKinney's rights were violated and that the illegal contraband and other evidence arising from that detention should have been suppressed, we must reverse the judgment unless we can determine "beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a). At trial, the officers testified about the discovery of the illegal contraband on McKinney's person and McKinney's statement claiming ownership of the illegal contraband. We cannot say beyond a reasonable doubt that the admission of this evidence did not contribute to his conviction. We therefore reverse the trial court's judgment and remand the cause for a new trial.

Karen Angelini, Justice

Publish