

# Fourth Court of Appeals
## San Antonio, Texas

**OPINION**

No. 04-14-00557-CR

Shamar Jerrell **JOHNSON**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 399th Judicial District Court, Bexar County, Texas
Trial Court No. 2012CR6088
Honorable Ray Olivarri, Judge Presiding

Opinion by:  Karen Angelini, Justice

Sitting:  Karen Angelini, Justice
Marialyn Barnard, Justice
Rebeca C. Martinez, Justice

Delivered and Filed:  July 8, 2015

REVERSED AND REMANDED

After the trial court denied his pretrial motion to suppress, Shamar Jerrell Johnson pled no contest to possession of a controlled substance and, pursuant to a plea-bargain agreement, was placed on deferred adjudication community supervision for a period of two years and fined $1,500.00, with $500.00 of that amount being probated. On appeal, Johnson brings two issues: (1) the trial court erred by denying his motion to suppress evidence because he was illegally detained and his consent to search was tainted by his illegal detention; and (2) the trial court's deferred adjudication order should be amended to reflect the oral pronouncement by the trial court that part

of the fine assessed would be probated. Because we agree that the trial court should have granted his motion to suppress, we reverse the trial court's order of deferred adjudication and remand the cause for further proceedings consistent with this opinion.

## BACKGROUND

Johnson was arrested for possession of a controlled substance after a warrantless search of his pockets produced a small Ziploc bag of cocaine. He filed a pretrial motion to suppress evidence, arguing that his detention and the search was illegal in violation of the Fourth and Fourteenth Amendments to the Constitution. At the suppression hearing, only two witnesses testified: Officer Christopher Connelly and Appellant Johnson.

Officer Christopher Connelly, a San Antonio police officer, testified that he was currently assigned to the POP unit or "Problem Oriented Policing," which addresses problems within the community and attempts to resolve them through both traditional and nontraditional methods. Officer Connelly testified that some of these methods include "patrol conducting surveillance, traffic stops, police presence, questioning community members . . . [and] trying to be proactive in deterring crime." According to Officer Connelly, at around 9:00 p.m. on March 11, 2012, he and Officer Cox were on patrol in their assigned area when they saw Johnson standing "in a poorly lit area behind a hotel parking lot there off of Lexington." "He was just kind of – appeared like he was loitering around this area." "He was just kind of standing there." Officer Connelly testified,

> That particular area of San Antonio is known for a lot of male prostitutes—prostitutes in general but mainly male prostitutes – narcotics, trafficking, burglaries. There are a lot of burglaries in that area. So when we came around the corner, we saw him kind of standing there. There's really no reason to be there in my opinion. I mean, you're on the sidewalk . . . . Again, he was like loitering in that area. And I say loitering but he was standing there in what appeared to be without a purpose. Again, you know, if it was a cigarette break or something like that, I can understand people stepping outside the hotel room away from other people to smoke a cigarette . . . . Again, if you're smoking a cigarette or something like that, I can understand that. But to stand there for no reason whatsoever on the street, a little – little odd especially between parking lots there where cars – and stuff like

that. A lot of times prostitutes are doing the same thing, they're loitering the street trying to pick up what they call "dates" – I guess the street term for date.

Officer Connelly explained that he and Officer Cox decided "to find out what he was up to, just a field contact." Officer Connelly testified that when the patrol car turned the corner and Johnson saw the car, Johnson's "eyes widened up, kind of startled and just kind of froze in place." According to Officer Connelly, when he and Officer Cox "contacted" Johnson, Johnson "appeared very nervous, immediately started with his hands in his pockets." Officer Connelly told Johnson to "put [his] hands out of [his] pockets for officer safety reasons." Officer Connelly said to Johnson, "Hey, I don't know if you have anything on you. I just want to make sure you don't."

Officer Connelly testified that Johnson "was cooperative." However, according to Officer Connelly, Johnson "kept talking and talking and talking as if he was nervous not wanting to let us talk. And then he put his hands back in his pockets." Officer Connelly testified, "When he kept putting his hands in his pockets, that's when I asked him to put his hands on the car." Officer Connelly testified that he did so because "[b]y being able to keep his hands on the hood of the car, [the officers were] able to see his hands." Johnson complied. Officer Connelly testified that Johnson "continued to be nervous" and so Officer Connelly asked Johnson if he had "anything illegal on [him]: drugs, knives, guns, any type of contraband that is considered illegal?" According to Officer Connelly, Johnson replied, "No, I don't have anything on me. You can search me. I'm clean." Officer Connelly testified that he then searched Johnson's pockets and found "a small Ziploc baggy of cocaine." Officer Connelly then arrested Johnson.

On cross-examination, Officer Connelly was asked why he did not mention that Johnson was "loitering" in his police report but instead wrote that Johnson was walking. Officer Connelly agreed that in his report he wrote that Johnson was walking around the back side of a hotel parking lot. Officer Connelly then gave the following explanation:

When I say walking, probably should have, but he wasn't walking with a purpose from point A to point B. He wasn't walking down the sidewalk, keep going and this and that. Someone can – they do not walk back and forth between a certain area. I guess most people call it pacing. . . . Again, if he was walking from – you know, if I turned around the corner and I saw him walking from point A to point B, that's probably a little less suspicious than walking back and turned around. He walks back and sees us. That's how he saw it because he turned around and saw us and got startled.

Officer Connelly confirmed that Johnson was standing near a hotel and two different clubs and that he noticed Johnson was a black man. Officer Connelly testified that one of the clubs was "a gay club" and that the area was "a well-known gay area." When asked whether on the night in question there were any reports of robbery, Officer Connelly testified, "On that particular night, not that I can remember, no actual call for robbery." Officer Connelly testified that he did not get an anonymous tip about criminal activity and that no one who resembled Johnson had been reported "doing anything wrong." Officer Connelly also confirmed that he had not seen Johnson commit a criminal act.

Johnson testified that he was a thirty-nine-year-old black, homosexual man. According to Johnson, between 8:00 p.m. and 9:00 p.m. on the night in question, he had "come from another club and parked" to go to another club. He testified he did not park in the parking lot for the club because it was full. According to Johnson, he was the only black man in that area at that time. Johnson testified he was walking to the club's door when the officers "kind of just sort of pulled up and opened both doors and then kind of sort of came to me, one on the left and one on the right." According to Johnson, it was "intimidating." "It was more like – like one was on this side and then one was on this side. So, in essence, I – I wasn't able to – to—well, to move, if you will. I felt kind of sort of like just can't go anywhere." Johnson testified that he did not "feel like I could leave when they were talking to me. I would have liked to have to leave." Johnson testified the officers talked to him "in a stern and intimidating manner" and were "firing questions" at him.

Johnson testified he "didn't feel like [he] could go anywhere." Johnson testified the officers "ordered [him] to put [his] hands on the hood of their vehicle." Johnson complied. According to Johnson, "I did not think and/or feel like I was able to leave, that I had to do exactly what they said."

After hearing the testimony, the trial court denied Johnson's motion to suppress. The trial court made the following findings of facts to support its ruling:

1. On the night of March 11, 2012, between 8:00 and 9:00 p.m., Officers Connelly and Cox with the San Antonio Police Department were on general patrol as part of the Problem Oriented Policing or POP unit. The POP unit is dedicated to resolving traditional problems with traditional and non-traditional methods. The officers in the POP unit use surveillance, traffic stops, police presence, questioning community members and try to be proactive in their approach. The patrol area included the Euclid and Lexington area.

2. They were in a marked police vehicle.

3. While turning off from a side street onto Lexington Ave., Officer Connelly noticed the defendant standing in a poorly lit area behind the Roadway Inn. The area is known to the officers as a "gay area," close to Club Essence and the Saint night clubs, two "gay clubs," and the area is also known for male prostitution.

4. Officer Connelly described the defendant as loitering, walking, or pacing in the area.

5. His experience and training led him to believe that the defendant was in the area, looking for "dates," which is engaging in criminal activity.

6. Because the officers believed the defendant was engaged in criminal activity, the two officers approached the defendant, because they wanted to find out why he was there. Although he seemed startled at the officers' presence "eyes widened up" kind of startled and just kind of froze in place, he was cooperative and answered their questions.

7. The defendant appeared "very nervous" and "immediately started with his hands in his pockets."

8. The officers asked the defendant to remove his hands from his pockets. He was described as overly talkative in what Officer Connelly described as "a nervous way." The defendant continued to put his hands in his pockets and the officers asked him to place his hands on the hood of the car.

9. Officer Connelly asked if the defendant had "anything illegal on him, any type of weapons, drugs, any contraband?" The defendant replied, "No, you can go ahead and search me, I'm clean."

10. At that point, the officer searched the defendant's pockets and found cocaine in his right front pocket.

11. The defendant was placed under arrest.

12. The Court finds the testimony of Officer Connelly credible.

## STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated standard of review. *Wilson v. State*, 311 S.W.3d 452, 457-58 (Tex. Crim. App. 2010); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). Although we give almost total deference to the trial court's determination of historical facts, we conduct a de novo review of the trial court's application of the law to those facts. *Wilson*, 311 S.W.3d at 458; *Carmouche*, 10 S.W.3d at 327. As the sole trier of fact during a suppression hearing, the trial court may believe or disbelieve all or any part of a witness's testimony. *Wilson*, 311 S.W.3d at 458; *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). However, a trial court necessarily abuses its discretion if it refuses to suppress evidence that is obtained in violation of the law and that is, therefore, inadmissible under article 38.23 of the Texas Code of Criminal Procedure. *Wilson*, 311 S.W.3d at 458; *Erdman v. State*, 861 S.W.2d 890, 893 (Tex. Crim. App. 1993).

## DISCUSSION

A defendant seeking to suppress evidence on the basis of an alleged violation of the Fourth Amendment bears the initial burden of rebutting the presumption of proper police conduct. *Young v. State*, 283 S.W.3d 854, 872 (Tex. Crim. App. 2009). A defendant meets this burden by demonstrating that the challenged search or seizure occurred without a warrant. *Id.* Here, it is undisputed that there was no warrant. Thus, the burden shifts to the State to prove that the search

or seizure was reasonable under the totality of the circumstances. *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009).

The Supreme Court has explained that there is a distinction between a consensual encounter between police and a citizen and a detention for purposes of the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 13 (1968). It is only when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen," will a court conclude that a seizure under the Fourth Amendment has occurred. *Id.* at 19 n.16. "Such a seizure occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *State v. Garcia-Cantu*, 253 S.W.3d 236, 242 (Tex. Crim. App. 2008) (citations omitted).

Here, the State has conceded that at the time of the search of Johnson's pockets, the encounter between the officers and Johnson was not consensual. According to the State, "[t]he record does not support the interaction between the officers and [Johnson] [being] a consensual encounter." The State reasons that while the officers encountered Johnson "in a public place, did not illuminate their lights and did not make a show of force," "the interaction began with Connelly asking [Johnson] to take his hands out of his pockets." According to the State, "[t]he record is then silent as to what words were exchanged next between [Johnson] and the officers." "With no further information, the State cannot make an argument that the record supports a consensual encounter." Thus, the State has conceded that it did not meet its burden of showing that the encounter between Johnson and the officers was consensual.

The State does argue that the record supports the officers having lawfully detained Johnson based upon reasonable suspicion. A warrantless detention that amounts to less than a full-blown custodial arrest must be justified by a reasonable suspicion. *Ford v. State*, 158 S.W.3d 488, 492

(Tex. Crim. App. 2005). An officer conducts a lawful temporary detention when he has reasonable suspicion to believe that an individual is violating the law. *Id.* Reasonable suspicion exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person actually is, has been, or soon will be engaged in criminal activity. *Id.* This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists. *Id.* A reasonable-suspicion determination is made by considering the totality of the circumstances. *Id.* at 492-93. And, the "question of whether a certain set of historical facts gives rise to reasonable suspicion is reviewed de novo." *Wade v. State*, 422 S.W.3d 661, 669 (Tex. Crim. App. 2013).

The State argues that the "record supports the officers approached [Johnson] in a dimly lit parking lot in an area known for male prostitution." The State points to Officer Connelly's testimony that Johnson appeared to be loitering, walking without a purpose, similar to someone looking for "dates." The State argues that Johnson's "conduct mimicked that of someone engaged in prostitution" and thus the officers had reasonable suspicion to conduct an investigatory detention. The State, however, is overstating Officer Connelly's testimony. Officer Connelly specifically testified:

> [Johnson] was like loitering in that area. And I say loitering but he was standing there in what appeared to be without a purpose. Again, you know, if it was a cigarette break or something like that, I can understand people stepping outside the hotel room away from other people to smoke a cigarette . . . Again, if you're smoking a cigarette or something like that, I can understand that. But to stand there for no reason whatsoever on the street, a little – little odd especially between parking lots there where cars – and stuff like that. A lot of times prostitutes are doing the same thing, they're loitering the street trying to pick up what they call dates – I guess street term for date.

Thus, Officer Connelly testified that Johnson was standing around in a dimly lit area without an apparent purpose (Officer Connelly later clarified that he meant pacing without an apparent

purpose) and many prostitutes in the area also "loitered" trying to pick up dates. We disagree with the State that this testimony is sufficient to support the officers having reasonable suspicion to detain Johnson. Being present in a "dimly" lit area, even one known for prostitution, at about 9:00 p.m. and walking without an apparent purpose does not support an officer having reasonable suspicion to suspect that person of engaging in prostitution. *See McKinney v. State*, 444 S.W.3d 128, 134 (Tex. App.—San Antonio 2014, pet. ref'd) (holding that being present in a high-crime area and fleeing from a police vehicle is not sufficient to support reasonable suspicion to conduct an investigatory detention); *Parks v. State*, 330 S.W.3d 675 (Tex. App.—San Antonio 2010, pet. ref'd) (holding that four individuals, with blue rags hanging from their pockets, walking behind a strip mall at 9:30 p.m. was not sufficient to support reasonable suspicion). These facts alone do not reasonably lead to the conclusion that someone is attempting to engage in prostitution. Therefore, because the officers did not have reasonable suspicion to detain Johnson, Johnson was illegally detained in violation of the Fourth Amendment.

Having concluded Johnson was illegally detained, we must consider whether Johnson's consent was an independent act of free will. In doing so, we consider (1) the temporal proximity of the illegal detention and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct. *United State v. Portillo-Aguirre*, 311 F.3d 647, 659 (5th Cir. 2002); *Pineda v. State*, 444 S.W.3d 136, 144 (Tex. App.—San Antonio 2014, pet. ref'd). With regard to the first factor, the record reflects that Johnson gave his consent soon after he was told by Officer Connelly to place his hands on the patrol vehicle's hood. With regard to the second factor, the record does not reveal any intervening circumstances that might have lessened the taint of the unlawful detention. With regard to the third factor, the record does not reflect that the officers' conduct was flagrant or that his purpose was to commit an illegal detention. *Cf. Portillo-Aguirre*, 311 F.3d at 659 (explaining that the officer routinely made extended detentions

to "detect evidence of ordinary criminal wrongdoing" without reasonable suspicion). Considering all three factors, we conclude that Johnson's consent to search his person did not dissipate the taint of the officer's violation under the Fourth Amendment because his consent was not an independent act of his free will. *See Pineda*, 444 S.W.3d at 144. Therefore, the trial court should have granted Johnson's motion to suppress.

Having concluded the trial court should have granted Johnson's motion to suppress, we must now consider whether the trial court's denial of the motion was harmful. Because Johnson's constitutional rights were violated, we must reverse the trial court's judgment of conviction or punishment unless we determine beyond a reasonable doubt that the trial court's error did not contribute to Johnson's conviction or punishment. *See* TEX. R. APP. P. 44.2(a). In this case, the trial court's denial of the motion to suppress was harmful error because it "undoubtedly contributed in some measure to the State's leverage in the plea bargaining process and may well have contributed to [Johnson]'s decision to relinquish his constitutional rights of trial and confrontation in exchange for a favorable punishment recommendation." *Pineda*, 444 S.W.3d at 144 (quoting *Castleberry v. State*, 100 S.W.3d 400, 404 (Tex. App.—San Antonio 2002, no pet.)).

We therefore reverse the trial court's order of deferred adjudication and remand the cause for further proceedings consistent with this opinion.[1]

Karen Angelini, Justice

Publish

---

[1] Having concluded the trial court's order of deferred adjudication should be reversed, we need not consider Johnson's second issue regarding whether the order of deferred adjudication should be amended.