**Opinion issued August 17, 2023**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-19-00608-CR

_____

**TAIRON JOSE MONJARAS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 232nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1614762**

---

## CONCURRING OPINION

On remand from the Court of Criminal Appeals, the majority holds that the peace officers who detained and searched Tairon Jose Monjaras did not have reasonable suspicion to do so. Accordingly, the majority further holds that the trial

court erred in denying Monjaras's motion to suppress the evidence obtained during the search and reverses his conviction and remands for further proceedings.

I agree with the result the majority reaches but disagree with its analysis in two respects. First, the majority erroneously relies on evidence the trial court did not consider below. Second, though the majority nonetheless reaches the correct result, its analysis gives insufficient consideration to the totality of the circumstances in assessing whether the officers had reasonable suspicion when they detained Monjaras, which may give readers the misimpression that the court did not apply the correct standard of review in reaching its result. So, I respectfully concur in the judgment but write to address these two shortcomings in the majority's analysis.

## THE RECORD

### Background

The majority derives the background facts on which it relies from three sources: the suppression-hearing testimony of the two arresting peace officers, J. Sallee and C. Starks, a copy of the offense report that they prepared, and the audiovisual footage of the encounter recorded by their body cameras. The majority devotes several pages to block quotations from the offense report. In doing so, the majority errs because the record shows the trial court did not consider the report.

The suppression hearing was relatively brief. Its transcript is about 40 pages.

2

Not long into the hearing, the State offered the offense report as an exhibit, and the trial court admitted the offense report into evidence without objection. Afterward, no witness referenced the offense report or referred to the report in any manner during the hearing. Neither did counsel for the parties or the trial court.

During the suppression hearing, the audiovisual footage from the officers' body cameras was played for the trial court during their testimony. After the witnesses testified and counsel presented argument, the trial court told the parties it wanted to review Sallee's body-camera footage once more before ruling. After doing so, the trial court denied the suppression motion without recessing or adjourning. That is, the trial court made up its mind based on the testimony and body-camera footage. It did not reserve its decision so that it could review the offense report, which had not been discussed or referenced beyond its admission into evidence.

**Applicable Law**

When, as here, the trial court makes a pretrial suppression ruling and does not revisit that ruling based on the evidence presented at trial, appellate review of the ruling is "limited to that evidence presented at the pretrial hearing—the evidence that was before the court at the time of its decision." *Black v. State*, 362 S.W.3d 626, 635 (Tex. Crim. App. 2012). The evidence before the trial court should not be misunderstood to consist of any and all evidence the trial court admits at the suppression hearing. Though there may be no distinction between the evidence

3

admitted and the evidence before the trial court in many instances, for purposes of appellate review the evidence before the trial court consists of "the evidence that was seen by, used by, or considered by the trial judge at the time he made a ruling." *Amador v. State*, 221 S.W.3d 666, 677 (Tex. Crim. App. 2007); *see also Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996) (explaining that appellate court ordinarily determines whether trial court's suppression ruling is supported by record based only on evidence adduced at hearing because trial court's ruling was based on this evidence). As the Court of Criminal Appeals has observed, while an appellate court cannot ignore evidence the trial court considered when it made its ruling, "it would be equally improper to consider evidence that the trial judge did not consider" when it made its ruling. *Amador*, 221 S.W.3d at 676. Thus, when a trial court does not consider particular evidence before ruling on a motion to suppress, we cannot consider this evidence even if the evidence is in the record. *See, e.g.*, *Taylor v. State*, 509 S.W.3d 468, 482 n.7 (Tex. App.—Austin 2015, pet. ref'd) (appellate court could not consider video that was not played for trial court before it ruled on defendant's motion to suppress evidence); *State v. Hartley*, No. 03-21-00230-CR, 2022 WL 2251659, at *2 n.2 (Tex. App.—Austin June 23, 2022, no pet.) (mem. op., not designated for publication) (appellate court could not consider parts of traffic-stop recording that trial court did not consider even though these parts were in record).

4

**Analysis**

Nothing in the record suggests that the trial court considered the offense report, which was admitted into evidence and then never referenced again by anyone. The suppression hearing was relatively brief. The trial court heard testimony from the two peace officers who detained, searched, and ultimately arrested Monjaras. During their testimony, the trial court reviewed the footage from the body cameras of these two officers and re-reviewed the footage from the body camera of one of the officers before ruling, which the trial court did without recessing or adjourning.

Under these circumstances, we should not consider the offense report on appeal because the record shows the trial court did not consider the report. *See Black*, 362 S.W.3d at 635; *Amador*, 221 S.W.3d at 676–77; *Rachal*, 917 S.W.2d at 809.

Notably, like the trial court, the Court of Criminal Appeals did not reference the offense report when it rendered its decision in this case. Instead, the Court relied on the testimony of the peace officers and the footage from their body cameras. *See Monjaras v. State*, 664 S.W.3d 921, 924 & n.1, 930–31 (Tex. Crim. App. 2022) (referring to officers' testimony and their body-camera footage and embedding images from body-camera footage into court's opinion in discussing salient facts).

Unlike the trial court and the Court of Criminal Appeals, the majority devotes much of its attention to the offense report. The majority spends about 16 pages on the case's background facts; of these, roughly a third are spent on the offense report.

Significant portions of this discussion are devoted to events that occurred after the officers had searched Monjaras and thus are not relevant to the issue before us: whether the officers had reasonable suspicion to detain him when they searched him. *See State v. Duran*, 396 S.W.3d 563, 569–70 (Tex. Crim. App. 2013) (reasonable suspicion cannot be based on facts officers acquired only after detaining person).

Hence, the majority's consideration of the offense report is not only improper, it also has the potential to lead our analysis astray. For this additional reason, we should not give the offense report consideration on appeal that the trial court did not.

In sum, in my evaluation as to whether Sallee and Starks had reasonable suspicion to detain and search Monjaras, I consider only the officers' suppression-hearing testimony and their body-camera footage. I do not consider the report.

## REASONABLE SUSPICION

### Background

A grand jury indicted Monjaras for unlawful possession of a firearm by a felon outside the premises where he lives. *See* TEX. PENAL CODE § 46.04(a)(2).

Monjaras moved to suppress the evidence against him. At the hearing on his suppression motion, the arresting officers, J. Sallee and C. Starks of the Houston Police Department, briefly testified. Their combined testimony spans just under 30 pages of the hearing transcript. No other witnesses testified at the hearing. Setting

6

aside the aforementioned offense report, the sole other evidence consisted of the audiovisual footage of the encounter recorded by the two officers' body cameras.

Officers Sallee and Starks were patrolling an apartment complex in a high-crime area in Houston just before noon in mid-December. Sallee slowly drove past Monjaras, who was on foot. Because Monjaras immediately looked down and did not make eye contact with the officers, Sallee made a U-turn to reapproach Monjaras.

By the time Sallee and Starks reapproached the area where they had seen Monjaras, Monjaras was gone. Given the short distance and time involved, Sallee concluded that Monjaras had "ducked off into an apartment, might have ran, could have been a couple of different things." Starks testified that he "believe[d]" Monjaras "had taken off running" because he would have been there otherwise.

About a minute or so later, Sallee and Starks came across Monjaras again on the other side of the apartment complex. Without activating their marked patrol vehicle's lights or sirens, Sallee parked. He and Starks got out and approached Monjaras to speak with him. Sallee testified that they did not suspect Monjaras was guilty of criminal activity at this point. Sallee further testified that if Monjaras had fled at this point, he would have let Monjaras do so because "[h]e was free to go." Starks also testified that Monjaras was "free to go at any time" and stated that he likely would have just watched Monjaras run away if Monjaras had done so.

7

The ensuing encounter was recorded by Sallee's body camera, which the State played for the trial court during Sallee's testimony. The recording shows Sallee had parked near Monjaras, got out of the vehicle, and initiated a conversation with Monjaras by saying, "Good morning. How are you doing, sir?" Sallee then introduced himself and shook Monjaras's hand. Sallee asked if Monjaras lived at the apartment complex, and Monjaras responded that he did. Sallee then asked if Monjaras had any identification on his person, and Monjaras said he had left it at home. In the meantime, Starks approached Monjaras from the opposite side, but Starks stood about five feet or so away from both Sallee and Monjaras.

Sallee asked if he could get Monjaras's name, and he also asked how Monjaras's day was going. Monjaras responded "yes" and "good." While Sallee got out a pen and notepad to take down Monjaras's name, Starks asked if Monjaras was a painter, presumably due to Monjaras's visibly paint-spattered trousers. Monjaras, responded "yeah, I paint," and then gave his name to Sallee. When Sallee asked how Monjaras's name was spelled, Monjaras asked for Sallee's pen and notepad so that he could write down the correct spelling. Sallee responded by saying "okay," and he handed his pen and notepad to Monjaras, who then wrote down his name. While Monjaras did so, Starks stepped away from the scene outside of the view of Sallee's body camera. Sallee then asked Monjaras if he had ever been arrested. Monjaras answered that he previously had been arrested for "assault, domestic violence."

Sallee confirmed the correct spelling of Monjaras's name and asked for Monjaras's birthdate. While this conversation took place, a female resident of the apartment complex walked into the frame of the recording and began addressing Starks about an unrelated matter. Starks then emerged from behind the rear of the patrol vehicle and conversed with the female resident at a distance. As Monjaras wrote down his birthdate, Sallee asked if Monjaras was nervous, noting that Monjaras's hands were shaking. Monjaras responded that he was nervous.

At this point, Starks ended his conversation with the other resident of the complex and reapproached Sallee and Monjaras. Starks took up a position across from Sallee that placed Monjaras nearly between the two officers. Starks was located about two feet away from where Monjaras stood. Sallee was as near or nearer.

Sallee asked if Monjaras had anything illegal, like illegal drugs, or weapons in his possession. Monjaras shook his head "no" in response. Sallee then asked, "May I search you and go in your pockets and stuff?" After Sallee asked this question, Monjaras began to empty one of his pockets. Sallee then told Monjaras to "hold on" three times within about two seconds. As Sallee did so, he extended his right hand toward Monjaras with his palm facing downward. Sallee then asked again, "May I search you?" When Monjaras continued to empty his pocket, Sallee stated, "It's a question. Hold on. Talk to me." As Sallee said this, he reached out and briefly placed his hand on Monjaras's left arm, the one Monjaras had used to reach into the

pocket. Monjaras began mumbling an explanation as to why he was emptying his pocket. Sallee then stated, "No, no, no. You are not understanding what I am saying." By this point, Starks had emptied his own hands and stepped within about a foot of where Monjaras stood. Starks then held his own hands out in front of him with his palms facing downward while simultaneously twice stating "manos," the Spanish word for hands. Monjaras responded by placing his hands, in which he held several items, in front of his stomach. Immediately before Starks gestured with his hands, Sallee placed his right hand on Monjaras's back, where it remained while Starks said "manos." Sallee and Starks were then flanking Monjaras, at which point Sallee asked, "May I search you? May I go in your pockets and search you?" Monjaras responded "yeah," at which point Sallee told Monjaras, "Okay, slide your hands on the car for me, please," referring to the officers' patrol vehicle.

Sallee searched Monjaras for about a minute. Near the outset of the search, Sallee tried to calm Monjaras's nerves, stating that "everything's okay," "you're good," and "gracias." Both officers also tried to reassure him by saying "no problemas." Sallee primarily searched Monjaras's clothing, including his pockets.

Part of the encounter was also recorded by Starks's body camera. Among other things, Starks's body-camera footage shows that at one point while Sallee was searching Monjaras, Monjaras tried to pat or empty a pocket. Starks restrained Monjaras from doing so by taking hold of Monjaras's right arm, raising Monjaras's

10

arm up slightly higher than waist level, and holding Monjaras's arm in this elevated position for about 10 seconds or so while Sallee continued to search Monjaras.

Sallee did not find any contraband while searching Monjaras's person.

During the search, Sallee asked Starks if Starks had "his mobile." Once Sallee finished searching Monjaras, Starks asked if he could see Monjaras's hands. Monjaras agreed, and Starks fingerprinted Monjaras using a mobile device. In the meantime, Sallee searched a bag that Monjaras was carrying and Sallee announced that he found bullets. Starks asked Monjaras if he had a gun, and Monjaras denied that he did. Starks then asked Monjaras why he had bullets if he did not have a gun. Monjaras replied that the bag in which they were found was his painter's bag.

Sallee's discovery of the bullets and Monjaras's nonresponsive answer apparently prompted Sallee to search Monjaras again. During this second search, Sallee announced that he found a gun, which was located in Monjaras's front waistband. Monjaras then began fighting Sallee in an attempt to draw the pistol from his waistband. Starks ended the fight by using his taser, which subdued Monjaras.

Sallee removed the pistol from Monjaras's waistband either near the end of the fight or immediately afterward. The pistol was .22 caliber, and it was loaded.

Once the officers had testified, both sides rested and argued their positions to the trial court. Afterward, the trial court again reviewed Sallee's body-camera footage in open court, specifically the footage between when Sallee activated the

11

audio before he approached Monjaras through when Sallee found the bullets. Without adjourning, the trial court denied Monjaras's motion to suppress the evidence. The trial court concluded the encounter was initially consensual. The trial court further concluded the officers had reasonable suspicion to detain Monjaras after they found the bullets in his bag because Monjaras admitted that he had been arrested for family violence, which may have made it unlawful for him to be armed.

Monjaras subsequently pled guilty to the offense of being a felon in possession of a firearm. The trial court assessed his punishment at five years of confinement.

When Monjaras appealed to this court, the majority initially upheld the trial court's suppression ruling and affirmed Monjaras's conviction over my dissent. The Court of Criminal Appeals reversed our court's judgment. *Monjaras*, 664 S.W.3d at 924. The Court held that while the officers' interaction with Monjaras began as a consensual encounter, the encounter escalated into a detention requiring reasonable suspicion of wrongdoing when Starks said "manos, manos" while Sallee had his hand on Monjaras's body. *Id.* at 928–32. The Court remanded the case to us to decide whether reasonable suspicion existed at the moment of detention. *Id.* at 932.

**Standard of Review**

In reviewing the denial of a motion to suppress, we almost totally defer to the trial court's express or implied determination of facts as long as they are supported by the record. *Martinez v. State*, 620 S.W.3d 734, 740 (Tex. Crim. App. 2021).

12

Determinations of fact include the who, what, when, where, how, and why in a given situation. *Baird v. State*, 398 S.W.3d 220, 226 (Tex. Crim. App. 2013). As factfinder, the trial court is the judge of the credibility and demeanor of the witnesses. *Martinez*, 620 S.W.3d at 740. But whether a given set of facts known to the officer at the time of a detention amounts to reasonable suspicion is a question of law that we review de novo on appeal. *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018); *see also State v. Cortez*, 543 S.W.3d 198, 203–04 (Tex. Crim. App. 2018) (appellate court reviews de novo application of law to facts that do not turn on credibility and demeanor and whether circumstances support existence of reasonable suspicion).

When, as here, the trial court views an audiovisual recording of the interaction between a citizen and a peace officer, we apply the same deferential standard of review to the trial court's determination of facts. *Duran*, 396 S.W.3d at 570. But we may review de novo indisputable audiovisual evidence contained in the recording. *Id.* So, for example, we disregard a trial court's fact findings or a witness's testimony when the recording conclusively contradicts them. *Id.* at 573; *see, e.g.*, *Miller v. State*, 393 S.W.3d 255, 263–65 (Tex. Crim. App. 2012) (several of trial court's findings had no support in recordings or testimony); *Carmouche v. State*, 10 S.W.3d 323, 331–32 (Tex. Crim. App. 2000) (recording showed that peace officer's testimony was inaccurate). When an audiovisual recording is indisputable, it is conclusive evidence. *Najar v. State*, 618 S.W.3d 366, 372 (Tex. Crim. App. 2021).

## Applicable Law

The United States Constitution's Fourth Amendment guarantees a citizen's right to be free from unreasonable searches and seizures. Article I, Section 9 of the Texas Constitution also guarantees this right. These constitutional guarantees cabin the exercise of authority by peace officers over their fellow citizens. *See Johnson v. State*, 912 S.W.2d 227, 233–34 (Tex. Crim. App. 1995) (plurality op.) (guarantee in Article I, Section 9 generally corresponds to Fourth Amendment). Both guarantees require that an investigative detention be supported by reasonable suspicion to be lawful. *See Johnson v. State*, 622 S.W.3d 378, 384 (Tex. Crim. App. 2021) (saying so as to Fourth Amendment). Only when a peace officer has reasonable suspicion may the officer temporarily detain a citizen for investigation limited to the reason for the detention. *Wade v. State*, 422 S.W.3d 661, 667–68 (Tex. Crim. App. 2013).

Reasonable suspicion exists when a peace officer has a particularized and objective basis for suspecting criminal activity. *Johnson*, 622 S.W.3d at 384. An officer has reasonable suspicion when he knows of specific, articulable facts that, when combined with reasonable inferences from those facts, would lead a reasonable officer to conclude the citizen has been, is, or soon will be engaged in criminal activity. *Id.* A mere hunch—a feeling or guess based on intuition rather than known articulable facts—is not enough. *Id.* Likewise, an officer's opinions, beliefs, and unsupported conclusions are not substitutes for articulable facts. *Ford v. State*, 158

14

S.W.3d 488, 493 (Tex. Crim. App. 2005). But the reasonable-suspicion standard is a relatively undemanding one, which is met when an officer is able to articulate facts that show some unusual activity has occurred, suggest some connection between the detainee and the unusual activity, and indicate that the unusual activity is related to crime. *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013). A peace officer need not be able to specify a particular penal infraction to possess reasonable suspicion of criminal activity, and reasonable suspicion does not require him to negate the possibility of innocent conduct. *Johnson*, 622 S.W.3d at 384–85.

In general, application of the reasonable-suspicion standard turns on the factual and practical considerations of everyday life on which reasonable people, not legal technicians, act. *Id.* at 385. In formulating reasonable suspicion, a peace officer can draw on his own individual experience and training. *Id.*; *see also Ramirez-Tamayo v. State*, 537 S.W.3d 29, 36 (Tex. Crim. App. 2017) (officer may rely on his experience and specialized training to draw inferences from and make deductions about cumulative information available to him that untrained person might not). However, reliance on experience and specialized training is not enough to establish reasonable suspicion absent objective factual support. *Ford*, 158 S.W.3d at 494. As reasonableness is the focus of the reasonable-suspicion standard, it is objective in nature and disregards the officer's subjective intent. *Wade*, 422 S.W.3d at 668.

Ultimately, whether reasonable suspicion exists turns on the totality of the circumstances. *Id.*; *see also Guzman v. State*, 955 S.W.2d 85, 90 (Tex. Crim. App. 1997) (observing that lawfulness of each search and seizure depends on facts of particular case). In this context, the totality of the circumstances is limited to information actually known to the peace officer, or the cumulative information known to cooperating officers, at the time of detention. *Furr v. State*, 499 S.W.3d 872, 878 (Tex. Crim. App. 2016); *Duran*, 396 S.W.3d at 569–70. Reasonable suspicion cannot be based on facts an officer only learned about after the detention was underway or after-the-fact rationalizations. *Duran*, 396 S.W.3d at 569–70.

### Analysis

The Court of Criminal Appeals held that Officers Sallee and Starks detained Monjaras when Starks said "manos, manos" while Sallee had his hand on Monjaras's body. *Monjaras*, 664 S.W.3d at 930–32. The question now is whether the officers reasonably suspected Monjaras of criminal activity at that moment. *Id.* at 932.

On appeal, the State says four circumstances show that the officers reasonably suspected Monjaras of wrongdoing. These four circumstances are the following:

(1) the officers were patrolling an area that has a high crime rate;

(2) Monjaras avoided eye contact when the officers first drove by him;

(3) Monjaras fled from the officers after they first drove by him; and

(4) Monjaras acted nervous when the officers questioned him.

As the majority correctly concludes, however, none of the circumstances on which

16

the State relies is sufficient to support a finding of reasonable suspicion in this case.

### *High-Crime Area*

Both officers testified the area they were patrolling had a high crime rate. Sallee stated that he and his partner were engaged in "crime suppression" due to a "rise in crime in the area." He further stated that he is "usually looking for obscene crime, that kind of stuff," while on this kind of patrol. Starks said they had been dispatched to engage in "crime suppression" there "due to a spike of violent crime." That said, both Sallee and Starks testified that they did not even suspect Monjaras of criminal activity at any point before they approached Monjaras to speak with him.

A neighborhood's reputation for high crime, in and of itself, cannot justify an investigatory detention. *Gurrola v. State*, 877 S.W.2d 300, 303 (Tex. Crim. App. 1994); *Gamble v. State*, 8 S.W.3d 452, 454 (Tex. App.—Houston [1st Dist.] 1999, no pet.). Being in an area known for crime, even a specific locale known for a particular type of crime, is not enough to justify a detention. *E.g.*, *Johnson v. State*, 469 S.W.3d 708, 714–15 (Tex. App.—San Antonio 2015, no pet.) (officer's testimony that defendant loitered without obvious purpose in dimly lit parking lot known for prostitution during evening hours did not establish reasonable suspicion). Rather, for a fact like an area's crime rate to give rise to an inference of criminality, "the surroundings must raise a suspicion that the particular person is engaged in illegal behavior." *Crain v. State*, 315 S.W.3d 43, 53 (Tex. Crim. App. 2010).

Here, Sallee and Starks were not responding to a reported crime, let alone a crime in which Monjaras was implicated. *See Gurrola*, 877 S.W.2d at 304 (distinguishing situations in which officer had been given exact description of defendant or in which officer was dispatched to respond to crime in progress). Sallee testified that he had never laid eyes on Monjaras before. Similarly, Starks testified that he did not "ever remember seeing him before." Thus, the officers had no reason to think Monjaras somehow contributed to the neighborhood's high crime rate.

### *Avoiding Eye Contact*

Sallee testified that when he first drove past Monjaras, Monjaras "immediately looked down" and "did not make eye contact at all." Sallee characterized Monjaras's refusal to make eye contact as being akin to how "a child would" behave if "doing something wrong." Sallee also stated that his partner told him that Monjaras "immediately looked up" after the officers had driven by him. Starks likewise testified that Monjaras "didn't look at us and that's not normal."

But Texas courts have rejected the claim that a defendant's observation of a police vehicle, standing alone, is suspicious. *E.g.*, *Rodriguez v. State*, 578 S.W.2d 419, 420 (Tex. Crim. App. [Panel Op.] 1979) (defendant glanced back over shoulder after patrol car drove past him); *Gamble*, 8 S.W.3d at 453–54 (defendant kept turning around to watch patrol car). If watching a marked police vehicle does not establish reasonable suspicion of criminal activity, then a defendant's failure to watch a

18

marked patrol vehicle or make eye contact with its occupants, standing alone, likewise cannot establish reasonable suspicion that criminal activity is afoot. *E.g.*, *Luera v. State*, 561 S.W.2d 497, 499 (Tex. Crim. App. [Panel Op.] 1978) (officers lacked reasonable suspicion as to defendant who looked straight ahead and did not look at officers when he passed them on road in absence of other furtive gestures). Indeed, ostensibly furtive eye movements in general are not on their own enough to support a reasonable-suspicion finding. *E.g.*, *Munera v. State*, 965 S.W.2d 523, 530–32 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd) (defendant's nervous behavior, including furtive eye movements, did not establish reasonable suspicion).

### *Flight from Officers*

Sallee testified that he made a U-turn after driving past because he wanted to see where Monjaras "was going or what was going on." When Sallee did so, however, Monjaras was no longer in view. Sallee explained that Monjaras's absence piqued his curiosity because it was "a pretty large breezeway and it would have been common to see him there, if walking," due to the "pretty short distance" involved. When Sallee was asked what he thought had happened, he stated: "Either he ducked off into an apartment, might have ran, could have been a couple different things." Starks, in turn, stated that he "believe[d]" Monjaras "had taken off running into the courtyard" because if he had continued walking, he would still have been visible.

As an initial matter, Sallee's and Starks's testimony about Monjaras's flight

19

is not based on specific, articulable facts of the kind required to support a finding of reasonable suspicion. Neither officer testified they saw Monjaras flee the area. And while the trial court is entitled to draw reasonable inferences from the facts in deciding whether reasonable suspicion existed for an investigatory detention, Sallee admitted there was more than one possible explanation for Monjaras's absence. Starks contemplated just one possibility—flight—but expressed his view as a belief, which he based solely on the unexplained assertion that Monjaras would have remained in view but for flight. Without additional explanation, this assertion is circular: Monjaras must have fled because otherwise he would have been there. Testimony of this sort is too speculative to support a finding that Monjaras fled, thereby giving rise to reasonable suspicion. *See, e.g.*, *Wade*, 422 S.W.3d at 672 (warden's testimony that he believed motorist was lying did not give rise to reasonable suspicion because his belief was supported by hunch, not specific, articulable facts); *Abney v. State*, 394 S.W.3d 542, 549–50 (Tex. Crim. App. 2013) (deputy's testimony that driver may have passed traffic sign 15 or more miles prior to location of stop was too speculative to support reasonable suspicion); *Garcia v. State*, 43 S.W.3d 527, 530–32 (Tex. Crim. App. 2001) (officer's testimony that child passenger looked back did not give rise to reasonable suspicion of seatbelt violation).

Assuming for argument's sake the trial court could have found that Monjaras departed the area to avoid any further contact with the officers, his departure cannot

20

support a finding of reasonable suspicion, regardless of his motive for departing. Absent a detention or arrest, a citizen may ignore, avoid, or disregard an officer just as he might any other passerby on the street. *See State v. Garcia-Cantu*, 253 S.W.3d 236, 243 (Tex. Crim. App. 2008) (in consensual encounters officers are no more entitled to demand citizen's attention than door-to-door salesmen, panhandlers, or street-corner squeegee men). Hence, a citizen's departure from the presence of peace officers, without more, is not suspicious, even if the citizen departs at a run, so long as the officers have not made a show of authority requiring the citizen's presence. *See Gurrola*, 877 S.W.2d at 303 (stating mere flight alone does not justify investigatory detention and rejecting characterization that defendant who walked away from deputy had fled); *see also McKinney v. State*, 444 S.W.3d 128, 134 (Tex. App.—San Antonio 2014, pet. ref'd) (running away from patrol car does not support reasonable suspicion of criminal activity absent show of authority by officers); *Gamble*, 8 S.W.3d at 454 (watching marked police car and walking away from it when it turns around does not give rise to reasonable suspicion to detain citizen); *cf. Kerwick*, 393 S.W.3d at 275–76 (defendant's flight—driving away after officer ordered him to stop—was one circumstance suggestive of wrongdoing and could be considered among totality of circumstances in reasonable-suspicion analysis).

It is undisputed that Sallee and Starks had not demanded that Monjaras remain present through a show of their authority. Both officers stated that they did not

activate their patrol vehicle's lights or sirens when they encountered Monjaras. They simply drove past him, turned around to reapproach him, and found he had gone.

### *Nervous Behavior*

After Sallee and Starks relocated Monjaras, Sallee initiated contact and began asking Monjaras a variety of questions. During the ensuing conversation, while Monjaras was writing down his date of birth, Sallee asked Monjaras if he was nervous, noting that his hands were shaking. Monjaras replied in the affirmative.

But nervousness, by itself, does not support a finding of reasonable suspicion. *E.g.*, *Wade*, 422 S.W.3d at 671; *St. George v. State*, 237 S.W.3d 720, 726 (Tex. Crim. App. 2007). As the Court of Criminal Appeals has said, most citizens are understandably nervous in the presence of the police and their nervousness legitimately increases when asked questions that are accusatory in nature. *Wade*, 422 S.W.3d at 671. Here, Sallee had already asked Monjaras if he had ever been arrested when Sallee noted Monjaras's hands were shaking and asked if he was nervous.

### *Totality of the Circumstances*

None of the four circumstances on which the State relies to prove reasonable suspicion suffice to do so when they are considered one by one. Sometimes, however, the whole is greater than the sum of its parts. Several circumstances that are inadequate to support a finding of reasonable suspicion individually may nonetheless do so when they are considered together. *Loesch v. State*, 958 S.W.2d

830, 832 (Tex. Crim. App. 1997) (holding appellate court must "look at all of the facts together" in deciding whether evidence supports finding of reasonable suspicion because inquiry turns on totality of circumstances and concluding court of appeals erred in examining each circumstance in isolation from other circumstances); *see, e.g.*, *Ramirez-Tamayo*, 537 S.W.3d at 38–39 (holding defendant's abnormally nervous behavior, in combination with several other circumstances, gave rise to reasonable suspicion to prolong investigative detention).

In this instance, however, the logical force of the four circumstances on which the State relies is inadequate to support a finding of reasonable suspicion even when they are considered together in the context of all the evidence. These four circumstances remain inadequate when considered together because, even in combination, they show Monjaras behaving as any citizen might without appearing unusual in his surroundings or rendering himself suspect. Specifically, Monjaras:

- was outside during daylight hours—near midday—on the grounds of the high-crime apartment complex where he resides;

- refused to acknowledge the presence of police who momentarily drove by him in a marked vehicle without its lights or siren activated;

- departed from an area being patrolled by police who had not accosted him, ordered him to halt, or otherwise detained him; and

- acted nervous when the police later approached him elsewhere and began asking him about his identity and whether he had ever been arrested.

Accepting these circumstances as true, they do not add up to reasonable suspicion because in the aggregate they do not demonstrate that Monjaras's behavior was

23

suspiciously unusual or otherwise indicative of criminality. *See Arguellez v. State*, 409 S.W.3d 657, 661–64 (Tex. Crim. App. 2013) (holding defendant's photography at public pool was not unusual, suspicious, or criminal and thus did not establish reasonable suspicion and that his departure from pool after police arrived was also not suspicious as there was no indication crime was afoot); *cf. Derichsweiler v. State*, 348 S.W.3d 906, 913–17 (Tex. Crim. App. 2011) (accepting trial court's findings of fact as true, Court of Criminal Appeals considered de novo whether they added up to reasonable suspicion and held findings as to defendant's bizarre behavior did so).

Though a peace officer's subjective impressions are not controlling as to the existence of reasonable suspicion, Sallee testified that he did not suspect Monjaras of anything in particular when he approached Monjaras. Sallee further testified that if Monjaras had run away when Sallee first asked him his name, Sallee would not have done anything because Monjaras "was free to go" at that time. Starks gave similar testimony, stating that Monjaras had not committed a crime when the officers first drove by him, and he then departed. Starks likewise agreed that Monjaras was free to leave when the officers reapproached him and engaged him in conversation. Starks testified that Monjaras "was free to go at any time." Had Monjaras simply run away from the officers, Starks said he probably would have watched him run away. In sum, with respect to three of the four circumstances on which the State relies on appeal—the neighborhood's high crime rate, Monjaras's refusal to make eye contact

with officers when they drove by, and his departure from the immediate vicinity afterward—neither officer thought they created reasonable suspicion to detain Monjaras. At the suppression hearing, Sallee and Starks both said they later reapproached Monjaras to engage him in a consensual encounter, not to detain him.

Nor did the officers learn of additional circumstances between the time they reapproached Monjaras and engaged him in conversation and the point in time when they detained him—the moment when Starks said "manos, manos" while Sallee had his hand on Monjaras's body—that could support a finding of reasonable suspicion. When Sallee greeted Monjaras, Monjaras returned his handshake and respectfully responded to his queries. Monjaras provided his name, birthdate, occupation, and place of residence. When asked about prior arrests, Monjaras divulged that he had a prior arrest for assault in the context of domestic violence. Of these additional facts, the sole one that conceivably could be damning is the prior arrest, which is not a basis for reasonable suspicion. *See Brodnex v. State*, 485 S.W.3d 432, 437–38 (Tex. Crim. App. 2016) (defendant's reputed status as "known criminal" not enough).

Sallee also observed that Monjaras had become visibly nervous, a circumstance that Monjaras readily acknowledged. As noted, however, nervousness alone will not support a reasonable-suspicion finding. Typically, when nervousness forms part of the factual basis for a finding of reasonable suspicion, it is one of multiple circumstances implicating the citizen in some criminal endeavor. *See, e.g.*,

25

*Hamal v. State*, 390 S.W.3d 302, 308 (Tex. Crim. App. 2012) (trooper had reasonable suspicion to detain driver for drug-related investigation, given that she was traveling late at night, exceeded speed limit, was visibly nervous, had prior criminal record, including arrests for drug offenses, one of which was recent, denied ever being in trouble before, and falsely claimed her arrests were long ago). But Sallee and Starks were not contemporaneously aware of any additional facts that, when combined with Monjaras's nervousness, suggested anything out of the ordinary. And reasonable suspicion cannot exist without an objective reason to believe that Monjaras was involved in something out of the ordinary indicative of criminal activity. *Davis v. State*, 947 S.W.2d 240, 244 (Tex. Crim. App. 1997).

Monjaras's cooperation came to an end once Sallee asked to search him, either because he did not understand the request or did not wish to comply with it. Sallee testified that he did not get the impression that Monjaras did not understand. Starks, in contrast, stated he did not know whether Monjaras understood the request. But even assuming Monjaras understood the request and simply did not wish to comply with it, his "refusal to cooperate with a police request during a consensual encounter cannot, by itself, provide the basis for a detention." *Wade*, 422 S.W.3d at 668.

In sum, considering the evidence in the light most favorable to the trial court's ruling, the totality of the circumstances do not support a finding that a peace officer could have reasonably suspected Monjaras of criminality when he was detained.

*Crain*, another case involving a conviction for unlawful possession of a firearm by a felon, reinforces this conclusion. 315 S.W.3d at 46. There, under circumstances similar to the ones before us, the Court held that those circumstances did not add up to the reasonable suspicion required for a detention. *Id.* at 53.

In *Crain*, an officer testified that he became suspicious of the defendant for two reasons. First, the defendant was walking after midnight in a residential area where burglaries occurred most often after midnight. *Id.* at 46, 53. Second, when the officer initially drove by the defendant in his marked patrol car, the defendant saw the patrol car and then grabbed at his waist. *Id.* But the officer did not have any reason to believe the defendant was engaged in criminal activity when he subsequently ordered the defendant to approach so that they could talk. *Id.* at 53.

In holding that these circumstances did not justify a detention, the Court noted that neither the time of day nor the level of the criminal activity in the area were enough to reasonably suspect the defendant of criminality. *Id.* If anything, the circumstances at bar are even less susceptible to a surmise of criminality. In *Crain*, the officer at least had in mind a particular crime committed during a particular time of night. *See id.* at 46, 53 (burglary after midnight). Here, in contrast, Sallee and Starks simply encountered Monjaras in a high-crime area in the middle of the day. Sallee and Starks were not responding to a reported crime in the area, which mirrors

the facts of *Crain*, inasmuch as there were no reported burglaries in the area on the night when the officer detained and arrested the defendant in that case. *Id.* at 53.

In *Crain*, the Court also noted that the officer testified the defendant could have been doing many different things when he grabbed at his waist and that his doing so did not necessarily mean that criminal activity was afoot. *Id.* This is comparable to Sallee's and Starks's testimony. Though Monjaras looked down when the patrol car passed and he departed from the area after it went by, Sallee testified that it was possible that Monjaras had left the area for more than one reason. Sallee further testified that he did not suspect Monjaras of a crime when the officers spotted Monjaras again on the other side of the apartment complex. Moreover, both Sallee and Starks testified that they likely would have allowed Monjaras to run away when they encountered him again because Monjaras was free to go as he pleased.

Finally, in *Crain*, the Court noted that when the officer first accosted the defendant, the officer did not even know whether the defendant was a resident of the house to which the yard in which he was standing belonged. *Id.* Sallee and Starks likewise did not know whether Monjaras resided in the complex when they decided to approach him. Suffice to say, being where one lives is not suspicious, and officers cannot reasonably suspect a person of criminality based on his presence alone without an indication that the person does not belong where he is present. *Cf. Johnson*, 622 S.W.3d at 385–88 (defendant's presence at park-and-ride late at night

was unusual enough to give rise to reasonable suspicion in part because lot was mainly used in daytime and there was little reason to be there in parked car so late); *Bobo v. State*, 843 S.W.2d 572, 573–75 (Tex. Crim. App. 1992) (defendant's presence in townhouse complex gave rise to reasonable suspicion in part because resident reported defendant had been "milling around some townhouses" and defendant was unable to reasonably explain why he was in complex when asked).

If the totality of the circumstances in *Crain* will not support the existence of reasonable suspicion, then the record here will not do so either. And it doesn't.

Of course, a citizen need not exhibit overt criminality as a predicate for reasonable suspicion. *Wade*, 422 S.W.3d at 670. But for reasonable suspicion to exist, the totality of the circumstances must be distinguishable enough from the everyday behavior of ordinary citizens to set the suspect apart from them. *Id.* The circumstances must show some unusual activity has transpired, suggest a connection between the suspect and the unusual activity, and indicate the unusual activity is related to crime. *Kerwick*, 393 S.W.3d at 273. On the subject of suspiciously unusual circumstances, the Court's decision in *Derichsweiler* is particularly instructive.

In *Derichsweiler*, an atypical DWI case, the police received a report of a motorist behaving bizarrely. 348 S.W.3d at 910. While a married couple was in the drive-thru lane at a McDonald's in the early evening hours of New Year's Eve, a motorist pulled up beside them in another car. *Id.* at 909. The motorist looked

29

directly at them and grinned for a period of about half a minute to a minute. *Id.* After the married couple had placed their order, they parked while their food was readied. *Id.* While parked, the same motorist then parked in the opposite space facing them, where he again stared and grinned at them, this time for less than half a minute. *Id.* Afterward, the motorist circled the restaurant and pulled up behind and to the left of the couple's car, staring and grinning at them for similar length of time or longer. *Id.* At this point, fearing they were being stalked or sized up for a robbery, the couple contacted the police by telephone, requesting emergency assistance. *Id.* at 909–10. As they did so, the other motorist drove into an adjacent Wal–Mart parking lot, where they saw him pull up beside at least two other parked cars. *Id.* Based on the couple's report, officers were dispatched to the scene. *Id.* at 910 & n.7. Once the officers located the motorist in question, they surrounded his car with three patrol vehicles and one of the officers then approached. *Id.* When the motorist rolled down his window in response, the officer smelled a strong odor of alcoholic beverage coming from the vehicle. *Id.* at 910–11. The officer then began a DWI investigation, which culminated in the motorist's arrest and prosecution for that offense. *Id.* at 911.

On appeal, the issue was whether officers reasonably suspected the motorist of a crime when they detained him by surrounding his car. *Id.* at 909–10 & n.7. While the Court regarded the case as presenting "a close call," it held that the officers had reasonable suspicion because the totality of the circumstances involved unusual

activity and indicated that this unusual activity was related to crime. *Id.* at 916–17. The Court reasoned that the motorist's behavior, "while not overtly criminal in any way, was bizarre to say the least." *Id.* at 917. Because the motorist engaged in a pattern of repeated behavior, seemingly scrutinizing multiple vehicles, it reasonably gave rise to an inference that he was "looking to criminally exploit some vulnerability—a weak or isolated individual to rob or an unattended auto to burgle." *Id.* So, the Court held "that the totality of the circumstances, viewed objectively and in the aggregate, suggests the realistic possibility of a criminal motive, however amorphous, that was about to be acted on." *Id.* That was enough to allow officers to detain the motorist briefly to investigate whether criminal activity was afoot. *Id.*

Unlike *Derichsweiler*, this is not a close case. Monjaras was walking on the grounds of an apartment complex at midday, an activity for which he owed no one an explanation. *See Gurrola*, 877 S.W.2d at 302 (four people engaged in argument in parking lot in late afternoon was not so out of ordinary as to give rise to reasonable suspicion); *Gamble*, 8 S.W.3d at 453–54 (no reasonable suspicion in case in which officers asked defendant—who had repeatedly turned to watch them after they passed by and who was walking on street's shoulder in high-crime area late at night—what he was doing, defendant replied that he was walking, and officers then detained defendant). What unusual circumstances existed at the moment of detention

31

that, though not overtly criminal, give rise to a reasonable suspicion that Monjaras was engaged in criminal conduct, notwithstanding the ordinariness of his behavior?

Setting aside the four circumstances already addressed, the lone additional circumstance the State references is that Monjaras wore a jacket and a knit hat. Sallee and Starks encountered Monjaras in December shortly before noon. Sallee testified that he thought Monjaras was overdressed because the temperature was in the mid-sixties or seventies. Starks also thought Monjaras "was not dressed appropriately."

Sallee's body-camera footage shows how everyone was clothed that day. While Monjaras wore a jacket, it was not a particularly heavy one. In its opinion in this case, the Court of Criminal Appeals described it as a "light jacket." *Monjaras*, 664 S.W.3d at 924. Starks himself wore a long-sleeved uniform, despite the ostensible warmth of the day. In contrast, Sallee and the female resident with whom Starks briefly spoke were in short-sleeves. None of them exhibited any obvious discomfort arising from the weather or their attire. Given the variation in dress, it is doubtful that this information gives rise to a reasonable inference that anyone's attire was inappropriate in light of the time of year or the day's temperatures (which the defense argued, without objection, at the suppression hearing fluctuated between 57° and 68° Fahrenheit between 6:00 a.m. and 12:00 p.m.). And considering the explanation the trial court gave for denying Monjaras's motion to suppress, the trial court does not seem to have relied on the way in which Monjaras was dressed.

Nor could the trial court have reasonably relied on the manner in which Monjaras was dressed in this instance. A defendant's attire, in and of itself, generally is not a valid basis for reasonable suspicion. *Thompson v. State*, 408 S.W.3d 614, 626 (Tex. App.—Austin 2013, no pet.). Here, Monjaras's mode of dress was not unusual under the circumstances, and his attire therefore cannot support a finding of reasonable suspicion. *See Davis v. State*, 947 S.W.2d 240, 242, 245 (Tex. Crim. App. 1997) (officer could not reasonably prolong traffic stop after initial basis for stop—suspicion of DWI—had been dispelled and further investigate for drugs on basis that driver was not dressed like someone who claimed to be on business trip); *Baker v. State*, 478 S.W.2d 445, 446, 449 (Tex. Crim. App. 1972) (fact that defendant "was barefooted, had long hair, and was shabbily dressed" did not provide officer with probable cause to arrest defendant or give officer grounds to stop and frisk him).

Even if Monjaras's donning of a jacket and knit hat could reasonably be characterized as unusual in the sense that he was overdressed for the weather, this would not suffice to create reasonable suspicion. It is not enough that a defendant's behavior is unusual, its unusualness must also hint at some sort of criminality. *See Kerwick*, 393 S.W.3d at 273 (circumstances must indicate unusual activity is crime-related); *see also Cotton v. State*, 480 S.W.3d 754, 758 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (discussing decision in which federal court held reasonable suspicion existed for investigatory detention when officer encountered two men

33

before dawn dressed in dark clothing marred by building insulation leaving business where multiple break-ins and thefts had previously occurred). Neither Sallee nor Starks testified that they suspected Monjaras had committed, was committing, or was about to commit a crime based on his mode of dress. On the contrary, they testified that they did not suspect him of any particular crime and would have let him run away had he chosen to do so when they initially sought to speak with him. The officers did not assert that Monjaras's mode of dress was indicative of criminality in general, like gang colors, or was unusual in a manner suggestive of some crime.

In conclusion, the record shows that Sallee and Starks detained Monjaras based on a mere hunch, rather than specific, articulable facts supporting the existence of reasonable suspicion. There is no indication the officers acted in bad faith or targeted Monjaras for invidious reasons. On the contrary, their gut instincts were vindicated in this case, as Monjaras was a felon unlawfully carrying a firearm. But neither their good faith nor the vindication of their gut instincts is a valid substitute for reasonable suspicion. *See Duran*, 396 S.W.3d at 569–70 (reasonable suspicion for detention cannot be based on facts learned afterward); *Gurrola*, 877 S.W.2d at 302 (detention based on mere hunch is unlawful even in absence of bad faith).

**CONCLUSION**

Because the State obtained the evidence against Monjaras in an unconstitutional search and seizure, the trial court erred in denying Monjaras's

motion to suppress the evidence. Thus, I concur in the majority's judgment reversing

Monjaras's judgment of conviction and remanding for further proceedings.

                                        Gordon Goodman
                                        Justice

Panel consists of Justices Kelly, Goodman, and Countiss.

Justice Goodman, concurring in the judgment.

Publish. TEX. R. APP. P. 47.2(b).